PER CURIAM.
 

 Thomas Anthony Wyatt, a prisoner under sentence of death, appeals the denial of his amended.and supplemental motions for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Through his postconviction motions, Wyatt challenges his first-degree murder convictions and sentences of death for the commission of a May 1988 triple homicide occurring at a Vero Beach, Florida, Domino’s Pizza restaurant. Wyatt also petitions this Court for writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const. Wyatt raises numerous claims before this Court but focuses primarily on two of those claims: the State presented expert testimony on comparative bullet lead analysis (CBLA), which evidence has now established is no longer a reliable science, and newly discovered evidence shows that a critical State witness testified untruthfully at trial. For the reasons set forth below, we affirm the postconviction court’s denial of relief and deny Wyatt’s petition for writ of habeas corpus.
 

 FACTS AND PROCEDURAL HISTORY
 

 On May 13,1988, Wyatt and his codefen-dant, Michael Lovette, escaped from a North Carolina prison road gang and fled to Florida, engaging in a spree of crimes along the way, including the murders of three Domino’s Pizza employees in Vero
 
 *92
 
 Beach and the murder of Cathy Nydegger near Tampa, which occurred just days apart. In a joint indictment, the State of Florida charged Wyatt and Lovette with the following crimes: four counts of first-degree premeditated murder, one count of sexual battery, three counts of kidnapping, two counts of robbery with a firearm, three counts of grand theft, one count of arson, and one count of possession of a firearm by a convicted felon. Prior to trial, the court severed the three Domino’s murder counts from the Nydegger murder count and also severed the firearm possession count from the other charges.
 
 [1]
 
 Wyatt and Lovette were tried separately.
 
 [2]
 

 The evidence presented at Wyatt’s trial on the Domino’s murder counts revealed the following. On May 16, 1988, Wyatt and Lovette stole a 1983 Cadillac Seville with a red-burgundy body and white canvas top in Jacksonville, Florida, and then drove down the east coast of Florida to the Vero Beach/Yeehaw Junction area near State Road 60. At sometime between 11:00 and 11:45 p.m. on May 17, both men entered a Vero Beach Domino’s Pizza restaurant armed with handguns. While Lo-vette held William Edwards, the store manager, at gunpoint in the office until the time lock on the store’s safe opened, Wyatt took Frances Edwards, who was William Edwards’ wife, and Matthew Bornoosh, a deliveryman, to the restroom in the back of the restaurant. Wyatt forced Bornoosh to remove his Domino’s shirt, and Lovette put it on.
 

 During the course of the robbery, Wyatt raped Frances Edwards. After the safe opened, the men retrieved money from inside the safe, and Wyatt shot all three victims to death: William Edwards was shot in the head and chest; Frances Edwards was shot in the head; and Matthew Bornoosh was shot in the left ear and head. Thereafter, Wyatt and Lovette fled the scene in the stolen Cadillac, heading west along State Road 60 toward Clear-water. On their way, the men burned the Cadillac and hitched a ride with a truck driver, who later identified Wyatt as one of the hitchhikers. Matthew Bornoosh’s shirt was recovered on the side of State Road 60 between where the burnt Cadillac was found and where the Domino’s was located. Handwriting found on several May 18 motel registration cards recovered from various motels located in Brandon and Clearwater, Florida, matched samples taken from both Wyatt and Lovette.
 

 At some point, the men then decided to go them separate ways. After spending several weeks on the west coast of Florida, Wyatt stole another vehicle and returned to South Carolina. On July 7, 1988, when a police officer stopped a stolen truck in which Wyatt was a passenger, Wyatt ran but was eventually caught and arrested.
 

 
 *93
 
 In January 1991, the jury found Wyatt guilty as charged. Throughout trial, Wyatt instructed his counsel that he did not want any witnesses called in mitigation. However, on the eve of the penalty-phase proceeding, Wyatt changed course and requested that counsel put on the testimony of his mother and sister. At the time of this request, Wyatt’s mother suffered from a mental disorder and was unable to testify. Her condition was worsening, and there was no prognosis as to when, or if, she would ever be able to testify. Wyatt’s sister had pregnancy complications and could not travel to testify for five months. As a result, Wyatt’s counsel moved for a continuance of the penalty phase based on each witness’s unavailability, which the trial court denied. Following this denial, Wyatt entered a written waiver of five statutory mitigating circumstances,
 
 [3]
 
 which the court found to be freely and voluntarily given. After a brief penalty phase, the jury unanimously recommended death as to each of the three Domino’s murders.
 

 The trial court followed the jury’s recommendation and found that the evidence established the following seven aggrava-tors: (1) the murders were committed while Wyatt was under a sentence of imprisonment; (2) Wyatt was previously convicted of a violent felony; (3) Wyatt was engaged in the commission of felonies when the murders were committed; (4) the murders were committed for the purpose of avoiding arrest; (5) the murders were committed for pecuniary gain; (6) the murders were especially heinous, atrocious, or cruel (HAC); and (7) the murders were cold, calculated, and premeditated (CCP). The trial court did not assign a specific weight to these aggravators and found that no mitigating circumstances had been established.
 

 On direct appeal,
 
 [4]
 
 this Court affirmed Wyatt’s convictions and death sentences.
 
 Wyatt v. State,
 
 641 So.2d 1336, 1341 (Fla.1994). However, the Court struck the CCP aggravator as not supported by the
 
 *94
 
 evidence, but concluded that eliminating this aggravating circumstance was harmless beyond a reasonable doubt in light of the six remaining aggravating circumstances and the lack of mitigation.
 
 Id.
 
 This Court also found that “the record [was] clear that Wyatt effectively waived presentation of mitigating evidence” and that “the trial court did not abuse its discretion by refusing to suspend the penalty proceedings indefinitely.”
 
 Id.
 
 at 1340.
 

 Wyatt’s postconviction proceedings spanned several years in light of complex public-records litigation. When Wyatt filed his final amended motion, he raised a total of twenty-seven claims, some of which included multiple subclaims.
 
 [5]
 
 Following
 
 *95
 
 two separate
 
 Huff
 

 [6]
 

 hearings, the postcon-viction court ordered that an evidentiary hearing take place on claim 3 (ineffective assistance of counsel and judicial and pros-ecutorial misconduct), claim 4 (newly discovered evidence), claim 5 (Brady
 
 [7]
 
 and
 
 Giglic
 

 [8]
 

 violations), claim 6 (ineffective assistance of counsel during jury selection), claim 7 (ineffective assistance of counsel for failure to investigate and prepare for the penalty phase), claim 9 (ineffective assistance of counsel for failure to investigate mitigating evidence), and claim 26 (newly discovered evidence on the discontinuation by the Federal Bureau of Investigation (FBI) of CBLA).
 

 At the first evidentiary hearing, Wyatt presented the testimony of several witnesses, and the State did not put on any evidence. Before the postconviction court ruled upon Wyatt’s final amended motion, Wyatt filed a supplement to his amended motion pending before the court. In this supplement, Wyatt raised four additional grounds for postconviction relief, numbered claims 28 through 31.
 
 [9]
 
 The court designated the supplement as a successive postconviction motion and denied Wyatt leave to amend. The court issued a sixty-page order denying all claims related to Wyatt’s final amended motion (claims 1 through 27). Following Wyatt’s appeal of those claims, he filed a motion to relinquish jurisdiction to litigate the supplement, which this Court initially denied. Consequently, the postconviction court stayed Wyatt’s supplement pending his appeal of claims 1 through 27.
 

 On January 23, 2009, Wyatt filed another motion to relinquish jurisdiction after postconviction counsel came into possession of letters, dated August 7 and October 22, 2008, from the FBI stating that at Wyatt’s trial, an FBI agent testified regarding CBLA in a manner that exceeded the limits of the science and could not be supported by the agency. This Court
 
 *96
 
 granted Wyatt’s motion, allowing Wyatt leave to amend his previous supplement to include this claim and further directing the postconviction court to hold an evidentiary hearing on both the allegations regarding CBLA and the further allegations that State witness, Patrick McCoombs, lied at trial. These claims were to be considered cumulatively with Wyatt’s prior postcon-viction claims. Thereafter, the postconviction court lifted the stay on Wyatt’s supplemental motion, and Wyatt filed an amended supplemental postconviction motion, specifically revising claim 30 to include allegations regarding his receipt of the 2008 FBI letters.
 

 In June 2009, the postconviction court determined that an additional evidentiary hearing would be held on claim 30 (challenging CBLA evidence) and claim 31 (inmate Emilio Bravo’s statement that McCoombs lied at trial). The State conceded that CBLA evidence had been “withdrawn by the FBI and [was] no longer supported by the scientific community.” At the second evidentiary hearing, Wyatt presented the testimony of several witnesses to support his challenges to the CBLA evidence used at trial and the truthfulness of McCoombs’ testimony. The State again did not put on any evidence. Following the evidentiary hearing, the postconviction court issued another order denying relief as to Wyatt’s final four claims.
 

 This appeal follows, and Wyatt simultaneously petitions this Court for a writ of habeas corpus.
 

 ANALYSIS
 

 I. RULE 3.850 CLAIMS
 

 Wyatt raises multiple issues in his appeal of the postconviction court’s denial of relief.
 
 [10]
 
 Initially, we note that Wyatt’s claim that trial counsel was ineffective for improperly conceding, or failing to object, to the admissibility of gruesome photographs is insufficiently argued and therefore waived for the purposes of appeal.
 
 [11]
 
 In addition, we also find that three
 
 *97
 
 other claims — Wyatt’s claims that the postconviction court erred in summarily denying his allegations that trial counsel was ineffective for not objecting to the admission of testimony detailing Wyatt’s prior violent felonies and for failing to preserve the issue that he was shackled throughout trial, and his claim that the penalty-phase jury instructions were unconstitutional — are procedurally barred, without merit, or both.
 
 [12]
 
 We next address in more detail the remainder of Wyatt’s postconviction claims.
 

 CBLA Claims
 

 In his first issue on appeal, Wyatt raises four subclaims regarding CBLA evidence that the State proffered through the testimony of FBI Special Agent John Riley at Wyatt’s trial in 1991. Specifically, Wyatt argues as follows: (1) the 2008 letter issued by the FBI in this case constitutes newly discovered evidence that would probably produce an acquittal on retrial; (2) because the FBI had knowledge of the flaws in CBLA at the time of Wyatt’s trial, the State’s knowing presentation of Agent Riley’s false testimony violated
 
 Giglio;
 
 (3) the State’s failure to disclose that Agent Riley’s testimony was unscientific and unsound violated
 
 Brady;
 
 and (4) to the extent that defense counsel failed to challenge CBLA as “junk science,” counsel rendered ineffective assistance under
 
 Strickland.
 

 For the reasons explained below, we conclude that the 2008 letter clearly qualified as newly discovered evidence; thus, the postconviction court erred in finding that the claim was procedurally barred and that the letter did not constitute newly discovered evidence. Regardless of these errors, we affirm the postconviction court’s denial of relief because Wyatt cannot demonstrate that consideration of the letter would probably produce an acquittal on retrial under the newly discovered evidence standard. As to the
 
 Brady
 
 and
 
 Gig-lio
 
 claims, there is no basis for concluding that the State withheld favorable evidence under
 
 Brady
 
 or knowingly presented false evidence at the original trial under
 
 Giglio.
 
 After the FBI discovered the errors in the original CBLA evidence introduced at trial, Wyatt was made aware of these errors by letter. Finally, we reject Wyatt’s ineffectiveness claim because the record shows that trial counsel retained an independent expert to evaluate the FBI’s comparative
 
 *98
 
 bullet lead analysis, and the expert provided counsel with no basis to challenge that analysis.
 

 Background Facts
 

 At trial, the State employed the testimony of Agent Riley to link bullets recovered from the victims’ bodies with bullets identified to be in Wyatt’s possession subsequent to the murders. Agent Riley testified as an expert on CBLA, which compares the elemental composition of lead bullets for forensic value. Specifically, Agent Riley opined that by comparing the elemental composition of the respective bullets, he was able to determine that the bullets found inside the victims and the bullets Wyatt was known to possess after the murders “came from the same box of ammunition ... or from another box of ammunition that was manufactured at the same place, on or about the same date.” Agent Riley qualified his explanation, stating that this was not “the only box that was manufactured that had this composition,” but that “it came from a batch of bullets made ... at the same factory on or about the same date.”
 

 Since Wyatt’s trial, various studies, including a February 10, 2004, report issued by the National Research Council (NRC), have undermined the scientific reliability of the correlation Agent Riley drew at trial. On September 1, 2005, the FBI, which was the only agency conducting CBLA in the United States, issued a press release announcing that the agency was discontinuing its use of CBLA. Several years later, the State received a letter from the FBI dated August 7, 2008, which referenced Wyatt’s case and stated in pertinent part:
 

 After reviewing the testimony of the FBI’s examiner,
 
 it is the opinion of the Federal Bureau of Investigation Laboratory that the examiner stated or implied that the evidentiary specimen(s) could be associated to a single box of ammunition. This type of testimony exceeds the limits of the science and cannot be supported by the FBI.
 

 Your office is encouraged to consult appellate specialists in your jurisdiction to determine whether you have any discovery obligations with respect to the finding stated above. As directed by the Department of Justice, we are notifying the Chief Judge of the court in which this case was tried of the results of our review by copying him or her on this letter.
 

 Additionally, you should be aware that the FBI is cooperating with the Innocence Project. The Innocence Project is interested in determining whether improper bullet lead analysis testimony was material to the conviction of any defendant, and, if so, to ensure appropriate remedial actions are taken.
 

 (Emphasis added.) The State later supplied this letter to Wyatt’s postconviction counsel. After conducting two evidentiary hearings, the postconviction court denied relief on Wyatt’s CBLA claims.
 

 Newly Discovered Evidence Claim
 

 Wyatt first contends that the postconviction court erred in its two-fold ruling that the FBI letter in this case did not constitute newly discovered evidence and that a claim relating to the letter’s subject matter was procedurally time-barred because it should have been raised within a year from the date the 2004 NRC report was issued. On appeal, the State subscribes to the same position as the postconviction court’s ruling.
 

 As an initial matter, the State contends that Wyatt’s claim is procedurally time-barred because a motion for postconviction relief in a capital case must be filed within one year from the date the new facts become known. According to the State,
 
 *99
 
 Wyatt should have raised this claim within one year from the date the NRC issued its February 10, 2004, report, which undermined the scientific reliability of the testimony that Agent Riley gave at trial, or one year from September 1, 2005, the date the FBI issued a press release announcing it was discontinuing its usage of CBLA. We reject the State’s position.
 

 The record reflects that unlike the NRC report or the FBI press release, the 2008 letter was based on the FBI’s own review of Agent Riley’s 1991 testimony in this case. Although the letter did not invalidate all of Agent Riley’s testimony, the agency clearly determined that his statement or implications “that the eviden-tiary specimen(s) could be associated to a single box of ammunition ... exceeded] the limits of science and [could not] be supported by the FBI.” In contrast, neither the 2004 NRC report nor the 2005 press release involved a concession that the testimony the FBI offered in past cases was unreliable and were only prospective in nature. Thus, we hold that a newly discovered evidence claim predicated upon a case-specific letter from the FBI discrediting the CBLA testimony offered at trial is not procedurally barred if timely raised. In the present case, upon receipt of the FBI’s 2008 letter, Wyatt timely filed a supplemental motion for postconviction relief, alleging that the letter constituted newly discovered evidence warranting a new trial, and, therefore, this claim is not time-barred.
 

 We now turn to the merits of Wyatt’s newly discovered evidence claim. This Court has held that a defendant bears the burden of establishing two requirements in order for a conviction to be set aside on the basis of newly discovered evidence: (1) the asserted evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence; and (2) the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.
 
 Jones v. State (Jones
 
 II), 709 So.2d 512, 521 (Fla.1998). The postconviction court held that the 2008 letter did not fall within the confines of the first prong of the “newly discovered evidence” test because the evidence was not “in existence at the time of trial,” relying on a statement in
 
 Kearse v. State,
 
 969 So.2d 976, 987 (Fla.2007). Wyatt challenges this ruling, asserting that the postconviction court erred in relying on this statement from
 
 Kearse.
 
 For the reasons that follow, we agree with Wyatt and recede from the statement in
 
 Kearse
 
 — which involved different circumstances — that the evidence “must have existed ... at the time of trial.”
 
 Id.
 

 In
 
 Jones v. State (Jones I),
 
 591 So.2d 911 (Fla.1991), this Court defined the first prong of the newly discovered evidence as facts that “must have been unknown by the trial court, by the party, or by counsel at the time of trial” and that “the defendant or his counsel could not have known them by the use of diligence.” 591 So.2d at 916 (quoting
 
 Hallman v. State,
 
 371 So.2d 482, 485 (Fla.1979)). In
 
 Jones II,
 
 we reaffirmed our abidance with that definition. See
 
 Jones II,
 
 709 So.2d at 521. In
 
 Kearse,
 
 we addressed a claim regarding newly discovered evidence where the defendant asserted a newly discovered evidence claim based on a mental health expert’s conduct, which occurred after the resentencing proceeding and involved a different defendant in a different state.
 
 Kearse,
 
 969 So.2d at 987. This Court rejected his claim, summarily holding that the allegations failed to meet either prong of the
 
 Jones II
 
 test. In our analysis, we noted that “the evidence did not exist at the time of the resentencing.”
 
 *100
 

 Id.
 
 We now clarify that the language “must have existed ... at the time of trial,” which was promulgated by this Court in
 
 Kearse
 
 and applied by the post-conviction court in this case, has never been a part of newly discovered evidence analysis and was an incorrect recitation of the test set forth in the
 
 Jones
 
 decisions.
 
 [13]
 

 This holding is in accord with our prior decisions, which have recognized newly discovered evidence claims predicated upon new testing methods or techniques that did not exist at the time of trial, but are used to test evidence introduced at the original trial.
 
 See, e.g., Preston v. State,
 
 970 So.2d 789, 798 (Fla.2007) (“There is no dispute that the DNA evidence concerning the pubic hair, showing that it did not belong to the victim, is newly discovered evidence.”);
 
 Hildwin v. State,
 
 951 So.2d 784, 788-89 (Fla.2006) (holding that new DNA testing of evidence indicating that semen and saliva on victim’s panties and washcloth excluding defendant as source and which refuted the trial serology evidence constituted newly discovered evidence). Moreover, we have also recognized newly discovered evidence claims predicated upon a witness who testified at trial but then subsequently recanted his or her testimony; the witness’s recantation, which did not exist at the time of trial, constituted newly discovered evidence.
 
 See, e.g., Hurst v. State,
 
 18 So.3d 975, 992-93 (Fla.2009) (recognizing the statements made by State witness after trial acknowledging that defendant did not confess to the crime was newly discovered evidence of recantation).
 
 [14]
 

 We reaffirm our continued adherence to the definition adopted by this Court in
 
 Jones I
 
 and
 
 Jones II:
 
 under the first prong of the newly discovered evidence test, the asserted evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence.
 
 See Jones II,
 
 709 So.2d at 521. Here, the 2008 letter explicitly states that Agent Riley’s testimony that the “evidentiary specimen(s) could be associated to a single box of ammunition ... exceeded] the limits of science and [could not] be supported by the FBI.” Although the FBI did not actually write the letter until August 2008, more than fifteen years after Wyatt’s trial, the flaws inherent in CBLA science were unknown or not publicly acknowledged at the time of trial. Accordingly, we hold that the case-specific letter authored by the FBI in this case constitutes newly discovered evidence because the letter consists of facts that Wyatt could not have known at the time of trial, and Wyatt or defense counsel could not have known of the facts by the use of diligence.
 

 With these determinations in mind, we now turn to the second prong of the test set forth in
 
 Jones I
 
 and
 
 Jones II.
 
 We
 
 *101
 
 conclude that Wyatt cannot prevail because he is unable to demonstrate that consideration of the 2008 letter would probably produce an acquittal on retrial. Importantly, the State did not base its case on the CBLA evidence alone; the jury obviously credited the extensive testimony offered by other witnesses who linked Wyatt to the murders. Testimony presented at trial revealed the following facts: DNA evidence matching Wyatt’s DNA was found inside one of the victims; Wyatt admitted to stealing the distinctively colored Cadillac, being less than a mile from the Domino’s on the night of the murders, and possessing a 38-caliber pistol; Wyatt made inculpatory statements to law enforcement officers after his arrest in South Carolina; all the victims were shot with the same 88-caliber weapon; and one witness observed that a red and white vehicle was parked outside the Domino’s at a quarter to midnight on May 17 and when she returned with the police at midnight, the vehicle was no longer there. Further, Agent Riley’s CBLA testimony simply linked the bullets found inside the victims to bullets that Wyatt possessed after the crime; the testimony did not indicate whether Wyatt, in fact, purchased those bullets or fired the murder weapon. Therefore, we ultimately conclude that the newly discovered 2008 letter regarding Agent Riley’s unreliable testimony was not of such nature that it would probably produce an acquittal on retrial.
 

 Giglio
 
 Claim
 

 Wyatt next contends that the State violated
 
 Giglio
 
 because the State failed to correct false testimony given by Agent Riley. In support, Wyatt asserts that Agent Riley’s testimony that the FBI’s CBLA analysts were able to give an opinion as to whether a certain bullet originated from a certain box of ammunition was false because the 2008 letter categorically rejects that proposition. Wyatt further contends that Agent Riley falsely testified that the FBI’s analysts conducted voluminous research on the composition of various bullets. The postconviction court denied relief on this claim, finding that Wyatt presented no evidence that the prosecutor had knowledge of these alleged falsehoods. We agree.
 

 To establish a
 
 Giglio
 
 violation, Wyatt must show that: “(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material.”
 
 Guzman v. State,
 
 868 So.2d 498, 505 (Fla.2003). “[T]he false evidence is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.”
 
 Id.
 
 at 506 (internal quotation marks omitted). “The State, as the beneficiary of the
 
 Giglio
 
 violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt.”
 
 Id. Giglio
 
 claims present mixed questions of law and fact. Accordingly, this Court defers to those factual findings supported by competent, substantial evidence, but reviews de novo the application of the law to the facts.
 
 Green v. State,
 
 975 So.2d 1090, 1106 (Fla.2008).
 

 Wyatt first argues that Agent Riley’s testimony, in which Riley stated that he was able to give an opinion as to whether bullets originated from a certain box of ammunition, was false because the FBI rejected that position in the 2008 letter it issued in this case. Wyatt’s postconviction expert, statistician Dr. Clifford Spiegel-man, established that the 2008 letter was the first time the FBI actually acknowledged that the testimony offered by Agent Riley in Wyatt’s case exceeded the limits of science and could not be supported by the FBI. As a result, it logically follows
 
 *102
 
 that the prosecutor could not correct false testimony based on information contained in a letter written and issued to the State over fifteen years after the conclusion of Wyatt’s trial. We therefore conclude that Wyatt’s reliance on the 2008 letter to establish a
 
 Giglio
 
 violation is misplaced.
 

 As to Wyatt’s second argument, he takes issue with Agent Riley’s testimony that the FBI “had to do a lot of research” and had “a lot of base data in order to reach conclusions” regarding CBLA. At the time of Wyatt’s trial, CBLA appeared to be an accepted science. During the evidentiary hearings, forensic metallurgist William To-bin testified that his own “pioneering research” uncovering the flaws in CBLA did not begin until 1999 and that he did not publish his first study on the subject until 2004 or 2005. Tobin further acknowledged that CBLA had been used in courts for forty years, that the FBI was the only laboratory that routinely offered such bullet lead comparisons, and that prior to 1991, CBLA was admitted in an overwhelming majority of cases and generally accepted by courts. However, Tobin’s current research reflected that the FBI never conducted any meaningful or comprehensive studies of the underlying assumptions used in the practice of CBLA and that the comparative aspect of the science was never wholly subjected to peer review. Along similar lines, Dr. Spiegelman testified that when compiling data for the 2004 NRC report, the FBI presented no comprehensive or meaningful research studies to establish the underlying premise of CBLA.
 

 Based on the evidentiary hearing testimony, it is arguable that Agent Riley’s testimony to the effect that the FBI had “a lot of base data” and had performed “a lot of research” may have been false at the time of trial. Yet, even if we were to assume that Agent Riley’s testimony in this regard were false, the postconviction court properly found that Wyatt presented no evidence that the prosecutor had knowledge of these alleged falsehoods. As Wyatt’s own experts indicated, research uncovering flaws in CBLA did not surface until well after Wyatt’s trial. Thus, Wyatt has failed to satisfy the second prong of
 
 Giglio,
 
 and we therefore deny relief on this claim.
 

 Brady
 
 Claim
 

 Next, Wyatt argues that the State suppressed favorable evidence in violation of
 
 Brady.
 
 Specifically, Wyatt contends that the State failed to disclose that the CBLA technique to which Agent Riley testified at trial was unscientific and unsound and that there was a lack of comprehensive research necessary to ensure the reliability of CBLA results.
 

 To meet the requirements of
 
 Brady,
 
 Wyatt must show that (1) favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.”
 
 Smith v. State,
 
 931 So.2d 790, 796 (Fla.2006) (citing
 
 Strickler,
 
 527 U.S. at 289, 296, 119 S.Ct. 1936). A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 See Way,
 
 760 So.2d at 913;
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936.
 

 There is no question the 2008 letter and research showing that Agent Riley’s testimony regarding the bullet match cannot be supported by science are favorable. This claim fails, however, because
 
 *103
 
 Wyatt has not satisfied the second prong of
 
 Brady.
 
 Wyatt’s own experts testified that neither the 2008 letter nor any comprehensive research uncovering the flaws in CBLA existed until well after Wyatt’s trial in 1991. Accordingly, the State could not have willfully or inadvertently suppressed such information.
 
 See Mungin v. State,
 
 932 So.2d 986, 998 n. 10 (Fla.2006) (“The State could not suppress information that was not available.”);
 
 Duckett v. State,
 
 918 So.2d 224, 235 (Fla.2005) (concluding that because favorable information contained within a report did not exist until after defendant’s trial, defendant “fail[ed] to establish that the State ‘either willfully or inadvertently’ suppressed the information”). We therefore affirm the postcon-viction court’s denial of relief on this claim.
 

 Ineffective Assistance of Counsel Claim
 

 In his final CBLA claim, Wyatt contends that counsel rendered ineffective assistance by failing to challenge the faulty premise underlying Agent Riley’s CBLA testimony to the extent that counsel could have known that CBLA was “junk science.” Following the United States Supreme Court’s decision in
 
 Strickland,
 
 this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
 

 Schoenwetter,
 
 46 So.3d at 546 (quoting
 
 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986)). We deny this claim because Wyatt has failed to establish that counsel was deficient.
 

 At the 2007 evidentiary hearing, defense attorney Diamond Litty testified that prior to Wyatt’s trial, the defense retained Dr. Raymond Hart, a metallurgist, to review the FBI’s analysis of the bullet lead in this case. Litty explained that because Dr. Hart did not render an opinion favorable to the defense, counsel chose not to proffer his testimony at trial. Further, as previously stated, Wyatt’s own experts testified that comprehensive research uncovering the flaws in CBLA did not exist until well after Wyatt’s trial. Accordingly, Wyatt has failed to meet the first prong of the
 
 Strickland
 
 standard.
 
 See Smith,
 
 931 So.2d at 801 (denying defendant’s claim that counsel was ineffective for failing to challenge an FBI expert’s testimony regarding CBLA under the first prong of
 
 Strickland
 
 where counsel hired an expert to examine the CBLA evidence in order to challenge it, the expert found no problems with the FBI analysis, and defendant’s own expert admitted at the postconviction hearing that no research, including the expert’s own research, was available to challenge the FBI evidence at retrial).
 

 Claims Regarding State Witness Patrick McCoombs
 

 Newly Discovered Evidence Claim
 

 With regard to Patrick McCoombs, a key State witness at trial, Wyatt contends that newly discovered evidence shows that McCoombs fabricated his testimony on the stand and that if the jury was aware of this information, it would probably have acquitted him or he would probably have received a lesser sentence. While the parties and postconviction court use the word “recantation” in discussing this claim, Wyatt is not raising an actual recantation claim because McCoombs testified during
 
 *104
 
 the evidentiary hearing that he was
 
 not
 
 recanting his trial testimony. Instead, Wyatt is asserting that new evidence demonstrates that McCoombs fabricated his trial testimony and that this evidence would be admissible in a retrial to impeach McCoombs’ original trial testimony. In support of his claim, Wyatt relies principally upon the perpetuated testimony of inmates Scott Rollins and Dennis Morrison, as well as the affidavit of inmate Emilio Bravo,
 
 [15]
 
 all of whom asserted that McCoombs allegedly admitted that his trial testimony against Wyatt was “significantly untruthful” while he was serving a prison sentence at ADX Florence, a federal maximum security prison in Colorado.
 

 During trial, McCoombs provided incriminating testimony against Wyatt. He testified that he was housed in the Green-ville County Jail in South Carolina from mid-March to mid-May of 1989, and that during this time period, he was in the cell next to Wyatt prior to Wyatt’s extradition to Florida. During the course of numerous conversations the two men shared, Wyatt relayed to McCoombs intimate details about the Domino’s robbery and murders. Specifically, Wyatt reported to McCoombs that he had committed a crime at a pizza restaurant in Vero Beach with an individual named Michael Lovette, whom McCoombs had never met. Wyatt informed McCoombs that after shooting the manager, who had begged for his life, Wyatt told the others that they “were dead” because he could not leave any witnesses. According to Wyatt, the woman began to cry and “the Cuban” started praying. Because Wyatt did not want to hear the woman crying, he shot her in the head. Wyatt also stuck the gun in “the Cuban’s” ear and said something to the effect of “[l]isten real close because you are going to hear it coming.” Wyatt then shot “the Cuban” in the ear, but because the shot was not fatal, Wyatt shot him again in the head. According to McCoombs, Lovette was at the front counter wearing “the Cuban’s” Domino’s shirt while the shootings occurred.
 

 At the 2007 evidentiary hearing, through their perpetuated testimony, inmates Rollins and Morrison both testified that McCoombs admitted that his trial testimony was untruthful. However, when pressed for specifics, Rollins could not recall any of the details regarding what McCoombs said, other than that it had something to do with the police requesting McCoombs to find out certain information about guns and advising McCoombs that if Wyatt did not discuss this matter, McCoombs should say that he heard Wyatt admit to statements about guns. According to Morrison, McCoombs admitted that Wyatt did not confess and that McCoombs had received the information to which he testified at trial from the police. Morrison also stated McCoombs reported to him that the police wanted Wyatt to discuss the location of a gun, which the police already possessed, and told McCoombs that he should testify that Wyatt did reveal this fact, even if he did not. During the hearing, McCoombs denied that he had lied at trial.
 

 The postconviction court reviewed all of the testimony and found that McCoombs’ testimony at the evidentiary hearing was
 
 *105
 
 more credible than the testimony of Rollins and Morrison. Of particular importance to the postconviction court, McCoombs’ trial testimony included statements that were consistent with, and corroborated by, other trial testimony and evidence, including: the Domino’s employees were taken to the bathroom during the robbery; Wyatt pistol-whipped the restaurant’s manager before killing him; Matthew Bornoosh had been shot with a gun that was placed inside his ear; Wyatt had stolen a car in Madeira Beach, Florida; and Wyatt used two types of bullets to kill the victims. Wyatt attempted to prove that McCoombs learned about this information from other sources because Wyatt allegedly shared legal documents with McCoombs while they were housed together. However, as the postconviction court noted, Wyatt did not prove a source for McCoombs’ knowledge other than Wyatt sharing the information himself because the only discovery document Wyatt may have had at the time both men were housed in the Greenville facility was the State’s extradition affidavit, which did not contain the facts to which McCoombs testified at trial. Moreover, these facts had not been released to the media.
 

 When “evaluating a trial court’s order, ‘this Court will not substitute its judgment for that of the trial court on ... the credibility of the witnesses and the weight to be given to the evidence,’ provided its order is supported by competent, substantial evidence.”
 
 Cherry v. State,
 
 959 So.2d 702, 709 (Fla.2007) (quoting
 
 Porter v. State,
 
 788 So.2d 917, 923 (Fla.2001)). Under this standard, this Court is “highly deferential to the trial court’s judgment on the issue of credibility.”
 
 Archer v. State,
 
 934 So.2d 1187, 1196 (Fla.2006). This is because “the trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony.”
 
 State v. Spaziano,
 
 692 So.2d 174, 178 (Fla.1997). Here, the postconviction court denied relief, holding that McCoombs’ testimony was more credible than the inmates’ testimony and was consistent with the record. The record provides competent, substantial evidence supporting the postconviction court’s findings. In fact, it is unclear whether the statements made by Rollins and Morrison concerning the gun would have any relevance to this case because no murder weapon was ever found or presented at trial. Their statements would be inadmissible during retrial as substantive evidence, and even if admitted to impeach McCoombs, they would do little to refute facts conclusively established by the record due to their lack of detail, and their testimony would not weaken the evidence of Wyatt’s role in this crime. Thus, we affirm the postconviction court’s ruling on this claim.
 
 [16]
 

 Undisclosed Federal Sentence Reduction Agreement
 

 Wyatt also contends that the State violated
 
 Brady
 
 by failing to disclose evidence of an agreement it made with McCoombs that in exchange for testifying, McCoombs would receive mitigation of his federal sentence. Wyatt further alleges that McCoombs’ testimony at trial that he was not receiving any benefit was false, and, by
 
 *106
 
 failing to correct this testimony, the State violated
 
 Giglio.
 
 The postconviction court denied these interrelated claims, finding that Wyatt presented no evidence to refute the testimony of McCoombs and State prosecutor David Morgan that at the time of the Wyatt trials in 1991, an agreement for sentence mitigation did not exist. A review of the record supports the postcon-viction court’s findings, and we affirm the court’s denial of these claims.
 

 At the time of Wyatt’s trial on the Domino’s murder counts in 1991, McCoombs was serving a federal sentence for his role in a South Carolina armed bank robbery. When called as a State witness, McCoombs testified that neither the State nor the federal government promised him anything in exchange for his testimony. McCoombs specifically stated that because he was in federal, and not State, custody, he did not believe any type of assistance from Florida officials would be possible and that his federal sentence was fixed pursuant to federal guidelines. Moreover, McCoombs never asked the State for a reduction in the sentence he was currently serving. On redirect, McCoombs reiterated that he had nothing to gain by testifying, was not promised anything in exchange for testifying, that his sentence had not been altered, and only noted that he was supposed to be placed in the witness protection program within the federal prison system.
 

 Likewise, at the evidentiary hearing, prosecutor Morgan testified that McCoombs had never requested anything in return for his testimony except for protection because he was concerned that Wyatt would use inside contacts to “get at him.” Morgan only promised McCoombs that he would do his best to ensure that authorities were made aware that McCoombs should be properly protected. On February 12, 1992, prosecutor Morgan wrote a letter to federal authorities stating that McCoombs had assisted the State in Wyatt’s cases and recommending sentence mitigation for McCoombs. However, this was not based on any prior agreement. An Assistant United States Attorney in South Carolina subsequently filed a motion for a reduction in McCoombs’ federal sentence based on this letter. The federal court ultimately granted the motion and reduced McCoombs’ sentence by around twenty months.
 

 The first prong of
 
 Brady
 
 requires Wyatt to demonstrate that “the State possessed evidence favorable to the accused because it was either exculpatory or impeaching.”
 
 Allen v. State,
 
 854 So.2d 1255, 1259 (Fla.2003). While this Court has previously held that evidence that a witness is receiving a benefit in exchange for testifying could be subject to a
 
 Brady
 
 challenge,
 
 see Guzman,
 
 868 So.2d at 508-09, and Morgan did testify that he sent a letter to federal authorities recommending sentence mitigation, there was no evidence that a deal was in fact made, as the postconviction court correctly found.
 

 Wyatt asserts that the lack of a “smoking gun document” evidencing such an agreement is not dispositive of this claim. However, there is no record evidence that the prosecutor’s post-trial letter to the federal government demonstrated proof of a pretrial agreement of assistance in exchange for McCoombs’ trial testimony. Wyatt has failed to meet his burden of showing there was, in fact, an agreement and thus the existence of evidence to withhold, and we therefore deny his
 
 Brady
 
 claim.
 
 See, e.g., Davis v. State,
 
 928 So.2d 1089, 1115-16 (Fla.2005) (rejecting defendant’s
 
 Brady
 
 claim that State suppressed information regarding a deal that State witness would receive gain time for his sentence in exchange for testifying because even though State did in-fact write a
 
 *107
 
 letter on witness’s behalf, there was no evidence that an agreement between the witness and the State was made).
 

 Wyatt’s
 
 Giglio
 
 claim suffers from the same problem.
 
 Giglio
 
 requires Wyatt to demonstrate that “the prosecutor presented or failed to correct false testimony.”
 
 Green,
 
 975 So.2d at 1106. Because the record is devoid of evidence to support his contention that Morgan’s letter or post-trial assistance rendered McCoombs’ trial testimony false or misleading in any way, Wyatt has failed to demonstrate that he is entitled to relief under
 
 Giglio. See, e.g., Jones v. State,
 
 998 So.2d 578, 580 (Fla.2008) (denying defendant’s
 
 Giglio
 
 claim because ample evidence in the record supported the trial court’s finding that no promise of leniency in exchange for favorable testimony between the State and a key trial witness existed, and that, therefore, witness’s testimony denying that any promise had been made was not false).
 
 [17]
 

 Penalty Phase Ineffectiveness
 

 In his next claim, Wyatt contends that trial counsel was ineffective for failing to fully investigate and present mitigating evidence for the penalty phase. He first alleges that his waiver of mitigation was invalid because defense counsel failed to conduct an adequate penalty-phase investigation into Wyatt’s social history, which would have unearthed substantial mitigating evidence relating to Wyatt’s troubled childhood, and hence, counsel could not advise him regarding the ramifications of waiving mitigation. Wyatt also asserts that trial counsel failed to adequately investigate and present the testimony of a mental-health expert, and further, that counsel failed to proffer to the trial court mitigating evidence regarding his mental health in light of his waiver of mitigation.
 

 Waiver of Mitigation and Counsel’s Failure to Proffer Evidence
 

 We review this claim in the context of Wyatt’s waiver of mitigation at trial. As this Court found on direct appeal, “Wyatt instructed his counsel throughout the trial that he did not want any witnesses called in mitigation,” and “the record [was] clear that Wyatt effectively waived presentation of mitigating evidence.”
 
 Wyatt,
 
 641 So.2d at 1340. Wyatt contends as a threshold matter that trial counsel were ineffective because they failed to proffer all available mitigation prior to Wyatt’s waiver in violation of this Court’s holding in
 
 Koon v. Dugger,
 
 619 So.2d 246 (Fla.1998). In
 
 Koon,
 
 this Court outlined the proper procedure by which trial courts must abide when a defendant waives the presentation of mitigating evidence:
 

 [C]ounsel must inform the court on the record of the defendant’s decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then
 
 *108
 
 require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel’s recommendation, he wishes to waive presentation of penalty phase evidence.
 

 Id.' at 250. “The underlying purpose for this framework is to protect against ‘the problems inherent in a trial record that does not adequately reflect a defendant’s waiver of his right to present any mitigating evidence.’ ”
 
 Waterhouse v. State,
 
 792 So.2d 1176, 1184 (Fla.2001) (quoting
 
 Koon,
 
 619 So.2d at 250). However, this Court’s decision in
 
 Koon
 
 was issued more than two years after Wyatt’s January 1991 penalty phase, and the
 
 Koon
 
 decision applied only prospectively.
 
 See Allen v. State,
 
 662 So.2d 323, 329 (Fla.1995). Thus, “[t]rial counsel cannot be deemed deficient for failing to foresee
 
 Koon.” Anderson v. State,
 
 822 So.2d 1261, 1268 (Fla.2002).
 

 Regardless of
 
 Koon’s
 
 applicability, the record reflects that during several exchanges in which Wyatt informed the trial court of his decision to waive mitigation, defense counsel noted on the record that Wyatt’s mother and sister could be used to establish mitigation relating to Wyatt’s upbringing and abusive childhood. Defense attorney Ernon Sidaway also explained that he was aware of, and would have available, family members and non-family members who could testify as to possible mitigation. Later, at Wyatt’s sentencing hearing, defense counsel acknowledged that he caused subpoenas to be issued for several witnesses for the sake of penalty-phase testimony, but those witnesses did not appear in light of Wyatt’s specific instructions. The record also shows that the trial court did engage in several on-the-record colloquies with Wyatt to ensure that his decision to waive mitigation was knowing and voluntary. In addition, prior to the penalty phase, Wyatt signed an express waiver of five statutory mitigating circumstances. Thus, the purpose sought by the
 
 Koon
 
 decision was essentially accomplished in this case, and Wyatt is not entitled to relief.
 

 Investigation into Wyatt’s Personal and Family Life
 

 Wyatt argues that penalty-phase counsel failed to conduct a reasonable investigation into certain aspects of Wyatt’s personal and family life (i.e., his social history), which would have unearthed substantial mitigating evidence that could have been presented at trial. He contends that this error rendered his waiver of mitigation invalid. In support, Wyatt relies principally on the evidentiary-hearing testimony of Dr. Faye Sultan, a clinical psychologist, who spoke to several of Wyatt’s family members and a family friend, all of whom reported that Wyatt had a troubled childhood characterized by physical and emotional abuse at the hands of his father and stepfather, a mentally ill mother who was neglectful and diagnosed with schizophrenia, and a drug and alcohol abuse problem beginning in middle school and that he suffered sexual abuse at the hands of an elementary school teacher.
 

 This Court’s precedent establishes that “a defendant may waive the presentation of mitigation evidence so long as [his or] her waiver is knowingly, voluntarily, and intelligently made.”
 
 State v. Larzelere,
 
 979 So.2d 195, 204 (Fla.2008). However, the Court has also “recognized that a defendant’s waiver of his right to present mitigation does not relieve trial counsel of the duty to investigate and ensure that the defendant’s decision is fully informed.”
 
 Grim v. State,
 
 971 So.2d 85, 100 (Fla.2007). As explained in
 
 State v. Pearce,
 
 994 So.2d 1094, 1102 (Fla.2008), irrespective of a defendant’s waiver of mitigation,
 

 
 *109
 
 an attorney’s obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated because this is an integral part of a capital case.
 
 See State v. Lewis,
 
 838 So.2d 1102, 1113 (Fla.2002) (citing
 
 Rose [v. State
 
 ], 675 So.2d 567 [ (Fla.1996) ] (holding that an attorney’s failure to conduct a reasonable investigation for possible mitigating evidence may render counsel’s assistance ineffective)). Although a defendant may waive mitigation, he should not do so blindly. Counsel must first investigate and advise the defendant so that the defendant reasonably understands what is being waived and reasonably understands the ramifications of a waiver. The defendant must be able to make an informed, intelligent decision.
 

 Consistent with
 
 Pearce,
 
 Wyatt contends that trial counsel did not adequately investigate possible mitigating evidence regarding Wyatt’s personal and family life during childhood and adolescence and that counsel failed to apprise him of such evidence, the results of which rendered his waiver of mitigation invalid.
 

 The record in this case demonstrates that contrary to Wyatt’s contention, counsel conducted a reasonable investigation into Wyatt’s personal history and family life and informed him of the results of that investigation before Wyatt decided to waive the presentation of mitigation. Both Sidaway and Litty testified at a hearing during the trial proceedings that despite their client’s wishes, they still continued to develop mitigation by retaining an investigator and traveling to North and South Carolina to interview Wyatt’s family members, non-family members, and neighbors. Sidaway and Litty were aware of potentially helpful mitigation regarding Wyatt’s personal and family life, did in fact obtain and review relevant records, were prepared to present at least twelve witnesses in mitigation, and had subpoenas issued, but not delivered, for the witnesses who had been notified that they might be called to testify. At the 2007 evidentiary hearing, Litty confirmed that throughout her investigation into Wyatt’s childhood for potential mitigation, she would present her findings to Wyatt as potential mitigation, but Wyatt refused to allow her to offer it even after she tried to persuade him. We conclude that defense counsel conducted a reasonable investigation into Wyatt’s personal and family life prior to his decision to waive mitigation and that Wyatt’s waiver was not rendered invalid. We therefore affirm the postconviction court’s denial of this claim.
 

 Failure to Investigate and Present Evidence of Brain Impairment
 

 Lastly, Wyatt argues that defense counsel failed to secure a complete neuropsy-chological evaluation that would have led to the discovery of brain impairment. In support, he cites at length to the postcon-viction testimony of Dr. Ernest Bordini who Wyatt asserts testified that Wyatt suffered from frontal lobe impairment. The postconviction court denied this claim, finding that Wyatt cited no authority entitling him to the appointment of a neurop-sychologist after having first been appointed a psychologist and a neurologist. Based on the facts of this case, we agree.
 

 During the 2007 evidentiary hearing, Litty testified that the defense retained Dr. Sheldon Rifkin, a psychologist well known in the legal community, to conduct a psychological evaluation of Wyatt. Litty further testified that in examining Wyatt, Dr. Rifkin conducted a battery of psychological tests, the results of which led Dr. Rifkin to opine that Wyatt was sane and competent to stand trial. Litty explained
 
 *110
 
 that Dr. Rifkin did not find any evidence of a closed-head injury. Following the issuance of his initial report, Dr. Rifkin requested from Litty additional medical records regarding a motorcycle accident in which Wyatt was involved years prior to the murders to rule out closed-head injury. Upon receipt of those records, Dr. Rifkin concluded that he could not find evidence of any kind of brain damage resulting from the motorcycle accident. Litty testified that she reviewed Dr. Rifkin’s evaluation with Wyatt. Despite Dr. Rifkin’s findings, Litty retained a neurologist, Dr. David MacMillan, to conduct a neurological examination on Wyatt. However, like Dr. Rifkin, Dr. MacMillan did not find any evidence of head injury or any other information that the defense could have used for mitigation purposes. Litty finally explained that an MRI conducted
 
 after
 
 Wyatt’s trial on the Domino’s murder counts but
 
 before
 
 Wyatt’s trial for the Ny-degger murder revealed no objective signs of brain damage or mental injury or disorder. In connection with the postconviction proceedings, Wyatt offered the testimony of Dr. Bordini, a neuropsychologist, who interviewed and administered standard neuropsychological tests to Wyatt. Dr. Bordini saw a “pattern of frontal lobe difficulties” including “some mild frontal lobe difficulties in planning, inhibition, [and] sequencing” and opined that frontal lobe damage most likely occurred as the result of a motorcycle accident in 1984.
 

 In cases with facts similar to those that are presented here, “[t]his Court has established that defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire.”
 
 Reese v. State,
 
 14 So.3d 913, 918 (Fla.2009) (quoting
 
 Darling v. State,
 
 966 So.2d 366, 377-78 (Fla.2007));
 
 see also Stewart v. State,
 
 37 So.3d 243, 251-52 (Fla.2010). Similar to
 
 Reese, Stewart,
 
 and
 
 Darling,
 
 where this Court affirmed the denial of ineffective assistance claims based on counsel’s failure to obtain neuropsychological testing, defense counsel in this case relied on the opinions of two mental health experts. Dr. Rifkin suggested that Wyatt be evaluated by a neurologist, Dr. MacMil-lan, and defense counsel followed that suggestion. Neither Dr. Rifkin nor Dr. Mac-Millan found any evidence of brain damage or head injury, and Wyatt did not establish that any mental health expert had recommended to defense counsel that Wyatt undergo neuropsychological testing. Further, an MRI conducted after Wyatt’s first trial but before his second trial in the Nydegger case revealed no objective signs of brain damage, mental injury, or disorder. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052. Even if the evaluations by Drs. Rifkin and MacMillan were somehow incomplete or inadequate when compared to the opinion of others, such as Dr. Bordini’s, defense counsel cannot be rendered ineffective for relying on the expert evaluations conducted by Drs. Rifkin and MacMillan at the time. That is, Wyatt “did not prove that a reasonable trial attorney should have known to not rely on the conclusions offered by the mental health experts who evaluated him. Thus, he did not prove that his counsel was deficient.”
 
 Stewart,
 
 37 So.3d at 253.
 

 Accordingly, we affirm the postconviction court’s denial of relief on these claims.
 

 Restriction on Right of Access to Public Records
 

 Without resorting to any case law for support, Wyatt essentially argues that
 
 *111
 
 Florida Rule of Criminal Procedure 3.852 and section 27.7081, Florida Statutes (2006),
 
 [18]
 
 unconstitutionally restrict his right to public-records access under the Florida and United States Constitutions because both provisions impermissibly mandate that his demand for public records not be “overly broad or unduly burdensome” and that he make his own search for records. We disagree.
 

 Section 27.7081 and rule 3.852 pertain only to the production of records for capital postconviction defendants.
 
 See
 
 § 27.7081(13), Fla. Stat. (2009); Fla. R.Crim. P. 3.852(a)(1). These provisions do not prevent a capital defendant from making postconviction public records requests. In fact, upon the issuance of this Court’s mandate, records relating to a capital defendant’s case are automatically required to be delivered to the postconviction repository. § 27.7081(7)(b)(l), (3), Fla. Stat. (2009); Fla. R.Crim. P. 3.852(g)(3)(A), (D). Should the agency receiving an additional request object to that request, a hearing will be conducted, during which the agency will advise the defendant as to why it cannot comply and what narrowing information would be required in order to comply with such a request.
 
 See Moore v. State,
 
 820 So.2d 199, 204 (Fla.2002) (“When a capital defendant claims that a state agency is withholding pertinent public records, the trial court should hold a hearing regarding such claims.”). This Court has “consistently held that a defendant must plead with specificity the outstanding public records he seeks to obtain.”
 
 Rodriguez v. State,
 
 919 So.2d 1252, 1273 (Fla.2005). As the Court has acknowledged, “rule 3.852 ‘is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief.’ ”
 
 Moore,
 
 820 So.2d at 204 (quoting
 
 Glock v. Moore,
 
 776 So.2d 243, 253 (Fla.2001)). Likewise, section 27.7081 provides for nearly identical methods of access to public records in capital postconviction cases. Requiring that a capital defendant’s additional request be timely made after a diligent search and that this request not be overly broad or unduly burdensome places a reasonable restriction on access to these records.
 
 See Allen v. Butterworth,
 
 756 So.2d 52, 66 (Fla.2000) (“[T]he Legislature has the prerogative to place reasonable restrictions on the right of public records access.... ” (internal quotation marks omitted)). This is because a capital defendant’s additional request follows the State agencies’ initial delivery to the repository. We conclude the requirement that a defendant make a diligent search through records already produced and narrow his or her request to provide adequate notice to the agency from which he or she seeks information is reasonable in the context of capital post-conviction claims.
 

 With respect to Wyatt’s as-applied challenge to section 27.7081 and rule 3.852, he has not alleged any particular records that were sought but denied under either provision in his case. Accordingly, Wyatt’s facial and as-applied constitutional challenges to both provisions lack merit.
 
 [19]
 

 
 *112
 

 Constitutionality of the Death Penalty
 

 In his final postconviction claim, Wyatt challenges the constitutionality of Florida’s death penalty statute and claims that both electrocution and lethal injection violate the Eighth and Fourteenth Amendments to the United States Constitution for preservation purposes only. We deny relief because the Court has consistently rejected these claims, and Wyatt has not made any additional allegations that would call into question the State’s current methods of execution.
 
 See, e.g., Stewart,
 
 37 So.3d at 262 (holding that Florida’s current lethal injection protocol is constitutional);
 
 Tompkins v. State,
 
 994 So.2d 1072, 1080-82 (Fla.2008) (upholding the constitutionality of Florida’s capital-sentencing scheme and lethal-injection protocol);
 
 Suggs v. State,
 
 923 So.2d 419, 441 (Fla.2005) (denying defendant’s claim that Florida’s capital sentencing scheme violates due process and constitutes cruel and unusual punishment on its face and as applied because the United States Supreme Court has repeatedly reviewed and upheld Florida’s death penalty statute).
 

 II. HABEAS CORPUS PETITION
 

 In his habeas corpus petition, Wyatt argues that certain omissions by his appellate counsel on direct appeal constituted ineffective assistance of appellate counsel.
 
 [20]
 
 Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus.
 
 Chavez v. State,
 
 12 So.3d 199, 213 (Fla.2009). To grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must resolve the following two issues:
 

 [Wjhether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
 

 Bradley v. State,
 
 33 So.3d 664, 684 (Fla.2010) (quoting
 
 Pope v. Wainwright,
 
 496 So.2d 798, 800 (Fla.1986)). Under this standard, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.”
 
 Anderson v. State,
 
 18 So.3d 501, 520 (Fla.2009) (quoting
 
 Freeman v. State,
 
 761 So.2d 1055, 1069 (Fla.2000)). Importantly, “[i]f a legal issue would in all probability have been found to be without merit had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate
 
 *113
 
 counsel’s performance ineffective.”
 
 Walls v. State,
 
 926 So.2d 1156, 1175-76 (Fla.2006) (quoting
 
 Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000)).
 

 Record on Appeal
 

 Wyatt first argues that appellate counsel rendered ineffective assistance due to an incomplete record on direct appeal. He contends that “critical portions of the record were missing” and specifically refers to an instance where the jury questioned the court during deliberations, the lack of a penalty-phase charge conference, and off-the-record “instructions” that occurred at record pages 3616, 3617, and 3618. Wyatt asserts that in light of these alleged omissions, appellate counsel was ineffective for failing to ensure that a proper record was provided to this Court. The record directly refutes this claim.
 

 In December 1992, appellate counsel filed a motion to relinquish jurisdiction for reconstruction of two portions of the record alleged to be missing: the penalty-phase charge conference and the circumstances under which the jury’s guilt-phase deliberation question was answered. At the August 1993 relinquishment hearing, there was first a discussion regarding the question posed by the jury during the guilt-phase deliberations. The prosecutor recalled that during deliberations, the trial court received a note from the jury and showed it to both counsel for the State and counsel for Wyatt. The trial court ordered the jury to rely on the instructions, and there were no objections. As to the discussion of the penalty-phase charge conference, the trial court found that the record on appeal spoke for itself, that it coincided with the court’s recollections, and that this Court could take the record on appeal as “settled record.” Upon review of the record, the trial court found that there was a sufficient discussion of the penalty-phase instructions, that the standard jury instructions were used, absent the mitigators that Wyatt waived, and that the trial court did not believe defense counsel raised any specific objections to such instructions. Following this relinquishment hearing, appellate counsel challenged the penalty-phase instructions on direct appeal. This Court held adversely to Wyatt, concluding that because defense counsel did not object to these instructions, this issue was not preserved.
 
 See Wyatt,
 
 641 So.2d at 1341.
 

 Wyatt has failed to establish that appellate counsel was deficient in any regard since counsel filed a motion to relinquish jurisdiction to reconstruct portions of the record alleged to have been missing and actually challenged the penalty-phase instructions on appeal. Even if appellate counsel were deficient, Wyatt cannot establish prejudice because he has failed to demonstrate how the record on appeal remained incomplete following the reconstruction hearing or to link a meritorious appellate claim to the allegedly missing record.
 
 See Henry v. State,
 
 937 So.2d 563, 577 (Fla.2006) (“Therefore, without any specificity as to how Henry has been prejudiced by the omissions in the record, denial of this claim is warranted under the applicable law.”);
 
 Armstrong v. State,
 
 862 So.2d 705, 721 (Fla.2003) (“Armstrong has failed to link a meritorious appellate issue to the allegedly missing record and thus cannot establish that he was prejudiced by its absence.”). Therefore, Wyatt is not entitled to relief on this claim.
 
 [21]
 

 
 *114
 

 Motion for Mistrial during Voir Dire
 

 Wyatt next contends appellate counsel was ineffective for failing to challenge the trial court’s denial of a motion for mistrial made during voir dire. In particular, Wyatt claims that the trial court’s commentary caused the venire to believe that a penalty-phase proceeding would be inevitable, resulting in error that warranted mistrial. This claim is without merit.
 

 When placed in context, Wyatt cites the following commentary made by the trial judge during voir dire as the basis for this claim:
 

 THE COURT: ... Again, members of the jury and of the jury panel,
 
 upon a finding of guilty in the guilt phase of this case
 
 of first-degree murder or of— that is premeditated murder or felony murder,
 
 we then go into a phase called penalty.
 

 It’s a separate proceeding in which each side can present testimony, argument, or whatever. At the end of that, I will give you certain criteria that you are to use in determining your recommendation to the Court on whether you should recommend to the Court either the death penalty or life imprisonment without the possibility of parole for twenty-five years.
 

 Those include certain aggravating circumstances and certain mitigating circumstances, which I will not go into now. Suffice it to say, will you all agree
 
 if we reach that stage
 
 — I’m
 
 not saying that we will, but if we reach that stage,
 
 will you all agree that you will be bound by the instructions of this Court — on reaching that stage, that you will be bound by the instructions of this Court in determining your recommendation to the Court?
 

 Will you all agree to do that?
 

 I think that ends it.
 

 (Emphasis added.) Immediately thereafter, defense counsel moved for a mistrial, which the trial court denied.
 

 Even if appellate counsel had raised the trial court’s denial of Wyatt’s motion for mistrial as an issue on direct appeal, it would have been meritless. This Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard.
 
 Salazar v. State,
 
 991 So.2d 364, 371 (Fla.2008). In this case, the trial court’s statements did not impermissi-bly lead the potential jury into believing that a penalty phase would be inevitable in light of Wyatt’s guilt. Although the trial court mentioned that the trial would proceed to a penalty phase, it prefaced that statement by explaining to the jury that a penalty phase would only be appropriate upon a finding of guilt. The trial court then again emphasized that a penalty phase was not absolute through its use of conditional language such as
 
 “if
 
 we reach that
 
 stage
 
 — I’m
 
 not saying we will, but if
 
 we reach that stage.” (Emphasis added.) Moreover, the trial court’s commentary about penalty-phase procedure was in direct response to, and prompted by, defense counsel questioning a prospective juror about factors the jury should consider in not recommending the death penalty. Therefore, the trial court did not abuse its discretion in denying Wyatt’s motion for mistrial, and appellate counsel was not in
 
 *115
 
 effective for failing to raise this meritless issue on appeal.
 

 CONCLUSION
 

 Based on the foregoing, we affirm the postconviction court’s denial of relief, and we also deny Wyatt’s habeas petition.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . In a related postconviction case, Wyatt also challenges his first-degree murder conviction and resulting death sentence arising from the murder of Cathy Nydegger. He raises nearly identical postconviction claims to those raised here, and a separate opinion will address those claims.
 
 See Wyatt v. State,
 
 No. SC08-656, 2011 WL 1899492 (Fla. oral argument held Apr. 6, 2011).
 

 [2]
 

 . Wyatt’s codefendant, Michael Lovette, was conyicted on all counts and sentenced to death.
 
 See Lovette v. State,
 
 636 So.2d 1304, 1305 (Fla.1994). On direct appeal, the Court upheld all of Lovette's convictions, except for the sexual battery offense, but vacated his sentences of death and remanded for a new penalty-phase proceeding because Lovette disclosed facts of the crime during a confidential mental health examination without waiving his attorney/client privilege and the mental health expert testified at trial.
 
 Id.
 
 at 1308-09. Lovette's case did not return to this Court, and the postconviction order notes that Lovette was resentenced to three consecutive life sentences.
 

 [3]
 

 . In a written waiver executed prior to the penalty phase, Wyatt waived the following statutory mitigating circumstances: (1) lack of significant history of prior criminal activity; (2) commission while under the influence of extreme mental or emotional distress; (3) the victim was a participant in Wyatt's conduct or consented to the act; (4) Wyatt acted under extreme duress or under the substantial domination of another person; and (5) the capacity of Wyatt to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 

 [4]
 

 . Wyatt raised the following claims on direct appeal: (1) the trial court erred in conducting voir dire; (2) the trial court erred in denying Wyatt’s motions to suppress physical evidence and statements; (3) the trial court erred in admitting testimony regarding DNA evidence; (4) it was reversible error to allow the State to inform the jury that Wyatt was an escaped convict; (5) the trial court erred in allowing collateral crime and character evidence to be admitted; (6) the shackling of Wyatt was prejudicial and resulted in reversible error; (7) the trial court erred in refusing to permit a proffer on whether Wyatt's fingerprints were illegally obtained; (8) the medical examiner’s testimony was speculative; (9) the trial court erred in instructing the jury; (10) the prosecutor's improper closing remarks resulted in fundamental error; (11) the trial court improperly denied Wyatt’s motion for continuance of the penalty phase so that defense counsel could present mitigation; (12) the CCP and HAC aggravators are unconstitutional; (13) the trial court erred by allowing evidence during the penalty phase that was outside the scope of aggravating and mitigating circumstances; (14) the trial court improperly admitted evidence of Wyatt's prior violent felonies and a photograph; (15) the use of hearsay during the penalty phase violated the Confrontation Clause; (16) the prosecutor’s closing argument during the penalty phase was improper; and (17) Florida’s death-penalty sentencing scheme is unconstitutional.
 

 [5]
 

 . Wyatt's final amended motion raised the following claims: (1) the State withheld public records in violation of Florida law; (2) section 119.19, Florida Statutes (Supp.1998), and Florida Rule of Criminal Procedure 3.852 are unconstitutional on their face and as applied to Wyatt and both violate the separation of powers; (3.1.) ineffective assistance of counsel for (A) counsel’s cumulative error; (B) counsel’s use of cocaine during trial; (C) failing to object to perpetuation of testimony from lead investigator Ronald Blanton; (D) failing to object to testimony of Larry Bou-chette; (E) failing to properly object to the prosecutor forcing Wyatt to testify as to veracity of State’s witnesses; (F) failing to object to questions regarding Wyatt’s collateral crimes; (G) failing to object to testimony from Rick Lindsey; (H) failing to object to testimony of Darrell Booth; (I) failing to investigate Wyatt’s drug and alcohol problem; (J) failing to rebut testimony of Patrick McCoombs; and (K) failing to secure a complete mental health evaluation; (3.II.) the trial court erred in; (A) failing to suppress unrecorded oral statements Wyatt made while in custody; (B) permitting McCoombs to testify regarding the "convict code”; (C) denying the motion to exclude DNA evidence; (D) refusing to instruct the jury on third-degree murder; (E) failing to conduct an individual voir dire of prospective jurors on the issue of pretrial publicity and their views regarding the death penalty; and (F) allowing cumulative error; (3.III.) the State erred by; (A) conducting improper cross-examination of Wyatt; (B) misstating evidence; (C) having an improper relationship with McCoombs; (D) making improper comments during the penalty-phase closing; and (E) permitting cumulative error; (4) Wyatt's convictions are unreliable because of newly discovered evidence of McCoombs’ fabricated testimony; (5) the State withheld material and exculpatory evidence and presented misleading testimony in regard to McCoombs; (6) counsel was ineffective for failing to move for individual voir dire in regard to pretrial publicity; (7) counsel was ineffective for failing to obtain an adequate mental health evaluation and to provide necessary information to the mental health consultant in violation of
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (8.1.) trial counsel was ineffective with respect to: (A) the introduction of gruesome photographs during the guilt and penalty phases and (B) the penalty-phase testimony regarding details of Wyatt’s prior violent felony and (8.II.) appellate counsel was ineffective for failing to properly litigate these issues on appeal; (9) trial counsel was ineffective for failing to; (A) adequately investigate mitigating evidence; (B) inform Wyatt of all available mitigation before he waived its presentation; and (C) proffer mitigating evidence to the trial judge before sentencing; (10) the penalty-phase jury instruction improperly shifted the burden of proof, and counsel was ineffective for failing to challenge this instruction; (II) the jury received inadequate guidance on the avoid arrest and CCP aggravators, and counsel was ineffective for failing to challenge both; (12) the "during commission of a felony” aggravator is unconstitutional, the jury instruction on that aggra-vator was inadequate, and counsel was ineffective for failing to challenge both; (13) the "pecuniary gain" aggravator is unconstitutional, the jury instruction on that aggravator was inadequate, and counsel was ineffective for failing to challenge both; (14) the "under the sentence of imprisonment” aggravator is unconstitutional, the jury instruction on that aggravator was inadequate, and counsel was ineffective for failing to challenge both; (15) the trial court erred in instructing the jury on the HAC aggravator because it did not apply, the jury instruction on that aggravator was unconstitutional, and counsel was ineffective for failing to challenge both; (16) counsel was ineffective for failing to request a jury instruction on mercy or sympathy; (17) trial and appellate counsel were ineffective for fail
 
 *95
 
 ing to litigate the issue that the trial court and prosecutor misled the jury by minimizing its role in sentencing; (18) the rule prohibiting the defendant from interviewing jurors is unconstitutional and denies the defendant effective assistance of postconviction counsel; (19) Florida’s method of execution is unconstitutional; (20) Florida’s capital sentencing statute is unconstitutional; (21) counsel was ineffective for failing to ensure that a complete record was available on direct appeal; (22) this Court’s harmless-error analysis with respect to the elimination of the CCP aggravator was constitutionally inadequate; (23) counsel was ineffective for failing to preserve the issue of Wyatt’s shackling for appeal; (24) the trial court and jury used unconstitutionally obtained prior convictions as aggravators in violation of
 
 Johnson
 
 v.
 
 Mississippi,
 
 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988); (25) Wyatt’s convictions and sentences are unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (26) newly discovered evidence exists regarding a 2005 press release issued by the Federal Bureau of Investigation, which announced that agency’s discontinuation of CBLA; and (27) Florida’s lethal injection statute and procedures are unconstitutional.
 

 [6]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [7]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [8]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [9]
 

 . These four claims, which resume the numerical order set forth in Wyatt's final amended postconviction motion, were as follows: (28) Florida’s lethal injection procedures are unconstitutional; (29) the Department of Corrections improperly delegated its authority to the Attorney General’s Office to create and implement lethal injection procedures; (30) newly discovered evidence based on November 2007 reports by
 
 60 Minutes
 
 and the
 
 Washington Post
 
 that FBI expert testimony exceeded the limits of CBLA science; and (31) newly discovered evidence from Emilio Bravo that State witness, Patrick McCoombs, lied at trial.
 

 [10]
 

 . Wyatt argues: (1)(A) the 2008 FBI letter concerning CBLA testimony constitutes newly discovered evidence that would probably produce an acquittal on retrial, (B) because the FBI had knowledge of the flaws in CBLA at the time of Wyatt's trial, the State’s knowing presentation of FBI Special Agent John Riley’s false testimony violated
 
 Giglio,
 
 (C) the State’s failure to disclose that Agent Riley's testimony was unscientific and unsound violated
 
 Brady,
 
 and (D) to the extent defense counsel failed to challenge CBLA as "junk science,” they rendered ineffective assistance under
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); (2)(A) the State withheld material impeachment material regarding witness Patrick McCoombs in violation of
 
 Brady,
 
 (B) the State allowed for the presentation of McCoombs’ false testimony in violation of
 
 Giglio,
 
 and (C) newly discovered evidence exists that McCoombs' trial testimony was fabricated, and if presented to the jury would probably produce an acquittal or lesser sentence on retrial; (3) the postcon-viction court erred in summarily denying his claims that counsel was ineffective for (A) improperly conceding, or failing to object, to the admissibility of unnecessary, cumulative, and gruesome photographs presented to the jury, (B) not objecting to the admission of penalty-phase testimony detailing Wyatt’s pri- or violent felonies, and (C) failing to properly preserve the issue that he was shackled throughout trial; (4) Florida Rule of Criminal Procedure 3.852 and section 119.19, Florida Statutes, unconstitutionally restrict his right to public-records access under the Florida and United States Constitutions and violate the separation of powers; (5) the penalty-phase jury instructions given at trial were unconstitutional; and (6) Florida’s death penalty statute is unconstitutional and death by electrocution or lethal injection constitutes cruel and unusual punishment.
 

 [11]
 

 .
 
 See Geralds v. State,
 
 - So.3d -, -, 2010 WL 3582955 (Fla.2010) (denying habeas claim regarding the admission of gruesome and cumulative photographs as insufficiently pled because defendant failed to specify
 
 *97
 
 which photographs he was challenging, did not articulate why the photographs were particularly inflammatory, and did not explain why they were inadmissible under governing case law).
 

 [12]
 

 . As to the testimony regarding Wyatt’s prior violent felonies, this claim is without merit because the record demonstrates that counsel repeatedly, and strenuously, objected to the State’s elicitation of specific details concerning Wyatt’s prior crimes. With regard to the shackling issue, this claim was raised and decided on direct appeal,
 
 see Wyatt,
 
 641 So.2d at 1340 n. 4, and is therefore procedurally barred,
 
 see Schoenwetter v. State,
 
 46 So.3d 535, 562 (Fla.2010). This claim lacks merit as well since the record demonstrates that counsel did, in fact, preserve this issue for appeal by objecting. Finally, as to Wyatt’s substantive challenge to the constitutionality of the jury instructions used during the penalty phase, this claim is procedurally barred because "[cjlaims regarding the adequacy or constitutionality of jury instructions should be raised on direct appeal.”
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008);
 
 see also Thompson v. State,
 
 759 So.2d 650, 665 (Fla.2000) ("The substantive challenges to these jury instructions are procedurally barred because Thompson could have raised these claims on direct appeal.”).
 

 We also deny Wyatt’s claim that the post-conviction court erred in failing to attach portions of the record to its order summarily denying relief because in the order, the court stated its rationale for the summary denial.
 
 See Demps v. Dugger,
 
 714 So.2d 365, 367 (Fla.1998).
 

 [13]
 

 . To the extent that
 
 Porter v. State,
 
 653 So.2d 374, 380 (Fla.1995), and
 
 Wright v. State,
 
 857 So.2d 861, 871 (Fla.2003), utilize language similar to that found in
 
 Kearse,
 
 we also conclude that such statements constitute incorrect recitations of the definition for newly discovered evidence.
 

 [14]
 

 . That is not to say that all new evidence, although not in existence at the time of trial but related to a case, is the equivalent of newly discovered evidence for the purposes of establishing a postconviction claim.
 
 See, e.g., Kearse,
 
 969 So.2d at 987 (holding that evidence of conduct by State’s expert witness in a separate, federal criminal case that postdated the appellant's trial did not constitute newly discovered evidence of impeachment material);
 
 Porter,
 
 653 So.2d at 379-80 (denying appellant’s claim that his good prison conduct after trial constituted newly discovered evidence for the purposes of his original trial in which a death sentence was imposed).
 

 [15]
 

 . When the parties attempted to perpetuate the deposition testimony of Bravo, Bravo refused to submit to cross-examination. As a result, Bravo's testimony was not offered at the evidentiary hearing, and only his affidavit was available. The postconviction court accepted the defense’s argument that Bravo's affidavit constituted newly discovered evidence, but ruled that the affidavit would not constitute substantive evidence because it was inadmissible hearsay and Bravo was never declared to be "unavailable” under section 90.804(1), Florida Statutes (2009). We agree with this ruling.
 

 [16]
 

 . As a corollary claim, Wyatt contends that McCoombs could be impeached at retrial with his evidentiary-hearing testimony in which he gave inconsistent responses when questioned about why he wrote his 2002 recantation letter, which he later withdrew. However, the postconviction court found McCoombs’ testimony to be credible and that he did not recant his trial testimony but merely made veiled threats of recantation to call attention to the harsh conditions of confinement eleven years after he was a government witness at Wyatt’s trial. These findings are supported by competent, substantial evidence.
 

 [17]
 

 . Wyatt similarly contends that the State's post-trial assistance to McCoombs in the years following his trial (i.e., through phone calls, letters, and public-records assistance) evidences proof of a pretrial, clandestine "quid pro quo” agreement that the State failed to disclose in violation of
 
 Brady
 
 and rendered McCoombs’ trial testimony false in violation of
 
 Giglio.
 
 Wyatt supports these claims only with speculation, and we therefore deny relief.
 
 See Maharaj v. State,
 
 778 So.2d 944, 951 (Fla.2000) ("Postconviction relief cannot be based on speculation or possibility.”). In addition, to the extent that Wyatt asserts that the State’s misconduct in this case precluded him from effectively cross-examining a key State witness or presenting a defense, Wyatt has failed to fully brief and argue these points, and he has therefore waived them for the purposes of this appeal.
 
 See Coolen v. State,
 
 696 So.2d 738, 742 n. 2 (Fla.1997) ("Coolen’s failure to fully brief and argue these points constitutes a waiver of these claims.”).
 

 [18]
 

 . Wyatt alleges that section 119.19, Florida Statutes, is unconstitutional. However, section 119.19 was renumbered as section 27.2081, Florida Statutes, on October 1, 2005.
 
 See
 
 ch.2005-251, § 39, Laws of Fla.
 

 [19]
 

 . Wyatt also alleges that both provisions infringe upon his federal constitutional rights, but he has not cited any authority demonstrating a federal right to public-records access. Wyatt further argues that both provisions violate the separation of powers, but this claim was insufficiently pled and therefore waived for the purposes of appeal.
 

 [20]
 

 . Wyatt also argues that this Court failed to conduct a constitutionally adequate harmless-error analysis on direct appeal and that the HAC and CCP aggravators, and their respective instructions, are unconstitutional. We reject these claims because "habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.850 motion.”
 
 Hardwick v. Dugger,
 
 648 So.2d 100, 105 (Fla.1994) (quoting
 
 Parker v. Dugger,
 
 550 So.2d 459, 460 (Fla.1989)).
 

 We also reject Wyatt’s claim that appellate counsel was ineffective for failing to assert that Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional because this Court has on numerous occasions rejected similar constitutional challenges to rule 4-3.5(d)(4), and appellate counsel cannot be deemed ineffective for failing to raise a non-meritorious claim.
 
 See, e.g., Floyd v. State,
 
 18 So.3d 432, 459 (Fla.2009) (rejecting claim that rule 4 — 3.5(d)(4) violated due process rights as well as the First, Sixth, Eighth, and Fourteenth Amendments);
 
 Power v. State,
 
 886 So.2d 952, 957 (Fla.2004) (rejecting contention that rule 4-3.5(d)(4) violated defendant's right of access to courts under Article I, Section 21, of the Florida Constitution).
 

 [21]
 

 . To the extent Wyatt argues that this Court was unable to review the complete record on appeal or satisfy its obligations under
 
 Delap v. State,
 
 350 So.2d 462, 462-63 (Fla.1977), this substantive claim is procedurally barred because it could have been raised on direct appeal.
 
 See Green,
 
 975 So.2d at 1115. It is also without merit since Wyatt has failed to
 
 *114
 
 show that portions of the record were missing, and if so, the specific prejudice he incurred in light of those alleged omissions. See
 
 Darling v. State,
 
 808 So.2d 145, 163 (Fla.2002).