PER CURIAM.
 

 Thomas Anthony Wyatt, a prisoner under sentence of death, appeals the denial of his amended and supplemental motions for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Through his postconviction motions, Wyatt challenges his first-degree murder conviction and resulting sentence of death for the May 1988 murder of Cathy Nydegger. Wyatt also petitions this Court for a writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const.
 

 In a related postconviction case, Wyatt also challenged his first-degree murder convictions and resulting death sentences arising from the May 1988 triple homicide occurring at a Domino’s Pizza restaurant in Vero Beach, Florida, which occurred approximately three days before this murder. Although involving some interrelated facts, those cases were tried separately. In Wyatt’s case involving the Domino’s pizza murders, he raised several nearly identical postconviction claims to those raised here. By separate opinion, we affirmed the denial of postconviction relief and rejected each of the claims.
 
 Wyatt v. State,
 
 71 So.3d 86 (Fla.2011). For the reasons below, we also affirm the denial of postconviction relief and deny Wyatt’s ha-beas petition in this case.
 

 FACTS AND PROCEDURAL HISTORY
 

 On May 13, 1988, Thomas Wyatt and Michael Lovette escaped from a North Carolina road gang and engaged in a crime spree, which spanned from North Carolina to Florida.
 
 [1]
 
 Once they reached Jacksonville, Florida, Wyatt and Lovette stole a Cadillac. On May 17, they entered a Domino’s Pizza store in Vero Beach, robbing the store and killing three employees.
 
 *517
 
 Shortly after this robbery, they burned the stolen Cadillac that was used in the Domino’s murders, and eventually reached Brandon, Florida, where they met Cathy Nydegger, the murder victim in this case. The trial judge severed the Domino’s Pizza murder charges from the Nydegger murder charge, and Wyatt was tried separately from codefendant Lovette.
 
 [2]
 

 In the Nydegger murder trial, the State presented evidence that Wyatt and Lo-vette stole a red and white Cadillac, which also contained a gun, a briefcase, a flask, and numerous other items. Wyatt and Lovette burned the stolen car near Yee-haw Junction, which is at the intersection of State Route 60, U.S. 441, and Florida’s Turnpike. A truck driver found the pair on State Route 60, close to where he smelled a burning car, and gave them a ride to Lake Wales. From there, Wyatt and Lovette obtained a ride further west across the state, ending up in Brandon, where they checked into a Budgetel Inn. On May 19, they took a taxi to Club 92, a bar that was close to their hotel. Later that night, Cathy Nydegger arrived at the bar, which she frequented. She joined Lovette and Wyatt in playing a crane game, where the player operates a joystick that controls a claw that lowers and attempts to grip small stuffed toys. The trio spent much of the night together, drinking and playing pool and the crane game. All three eventually left for the evening in Nydegger’s car.
 

 Nydegger’s body was found the next day along State Route 60, a few miles away from where the stolen red and white Cadillac had been burned. Near Nydegger’s body, the police found a white pillow case and small stuffed animals, which matched animals found in the crane game. The medical examiner testified that Nydegger died due to a single gunshot to the top of the head, and the gun must have been in contact with the skin when the trigger was pulled. He estimated that the time of death was in the early morning hours of May 20, 1988. Codefendant Lovette’s DNA was found inside the victim.
 

 On May 20, 1988, Wyatt checked into a motel in Tampa by himself, arriving in a car that matched the victim’s vehicle. He asked where he could take the car because it had a transmission problem. At the motel, Wyatt met Fred Fox and discussed that the car was having transmission problems. Fox rode with Wyatt when he took the car for repairs, but Wyatt left it in a parking lot, rather than bringing it to a repair shop, claiming that somebody else would pick up the car for him. The victim’s car was found abandoned in a parking lot much later. Inside the vehicle, police found stuffed animals that were consistent with the crane game, a white pillow that was consistent with the pillows at the Budgetel Inn where Wyatt was staying the night he met Nydegger, and a few hairs that were consistent with Wyatt’s hair.
 

 The State also presented evidence to show that Wyatt had a .38-caliber gun and bullets. Fox took the gun and sold the gun at a pawn shop. When Wyatt learned that Fox sold his gun, Wyatt became angry and told Fox that he “used it to kill people.” The police eventually recovered this gun, and it was found to be consistent with the gun that killed the victim. The police also recovered the remaining bullets, which Wyatt had left with Fox.
 

 Wyatt left the state after he stole another vehicle. He was finally apprehended in South Carolina. Upon his arrest in South
 
 *518
 
 Carolina, during a stationhouse interview, a police officer asked Wyatt, “[I]s there someone inside of you or something that makes you do certain things in your life?” Wyatt responded that there was a person named Jim who would take over his life when he drank and admitted that “Jim went crazy in Florida” and that Jim has killed. Wyatt also told the officer, “Jim needs to be killed before he hurts somebody again.”
 

 While Wyatt was awaiting extradition to Florida, he developed a friendship with a fellow inmate, Patrick McCoombs, who testified at trial. According to McCoombs, during their many conversations, Wyatt admitted that he had killed Nydegger and mentioned numerous aspects about his exploits in Florida, including particular details about Nydegger’s murder. In addition, the State also presented the testimony of Special Agent John Riley from the Federal Bureau of Investigation (FBI), who conducted an elemental and metal analysis on the bullet found in Nydegger and compared it to a sample of the bullets that Wyatt had left with Fox, concluding that the two bullets came from the same box of ammunition.
 

 Wyatt testified in his own defense, admitting that he was at Club 92 and had met Nydegger while he was playing the crane game, but asserted that Lovette was the person who was with her most of the evening. According to Wyatt, around midnight, they all agreed to go back to Wyatt’s hotel room to drink some beer. After drinking for more than an hour, Lovette and Nydegger left to buy more beer and food. Wyatt passed out and did not wake up until 8 o’clock the next morning when Lovette came back to the room alone. Wyatt testified that Lovette informed him that Nydegger gave him permission to use her car until about 1 p.m. Lovette then left for breakfast, but never returned. Wyatt took Nydegger’s car to look for him, but eventually he abandoned his search and checked into a different motel. He abandoned Nydegger’s car while he was staying at the motel, taking both his and Lovette’s personal items out of the ear first. The jury convicted Wyatt of the first-degree murder of Nydegger.
 

 During the penalty phase, the State presented testimony regarding some of Wyatt’s other violent crimes, including that between May 13 and May 18, he escaped from prison, he kidnapped and robbed an employee who was working at a Chinese restaurant, he robbed a Taco Bell store, and he killed three employees at a Domino’s Pizza. Wyatt presented six lay witnesses who testified that Wyatt was a good person but had an abusive childhood, a mentally ill mother who was institutionalized for much of his childhood, and a sexually abusive teacher. These witnesses also testified that Wyatt began abusing drugs at an early age and the more he abused drugs, the more criminal trouble he encountered. Wyatt did not present a mental health expert at the penalty phase, although his counsel had procured numerous mental health examinations.
 

 The jury recommended the death penalty by a vote of eleven to one. The judge followed the recommendation and sentenced Wyatt to death. The judge found five aggravating factors: (1) Wyatt was under a sentence of imprisonment at the time of the murder; (2) Wyatt had previously been convicted of violent felonies; (3) the murder was committed during the course of a robbery and was committed for pecuniary gain (merged); (4) the murder was committed for the purpose of avoiding arrest; and (5) the murder was cold, calculated, and premeditated (CCP). The court found no statutory mitigating factors, but recognized as nonstatutory mitigation that in his early youth, Wyatt had lived in a broken and unstable home while his men
 
 *519
 
 tally ill mother was in and out of mental hospitals.
 

 On direct appeal, this Court affirmed Wyatt’s conviction for first-degree murder and his sentence of death.
 
 Wyatt v. State,
 
 641 So.2d 355, 360 (Fla.1994).
 
 [3]
 
 However, this Court agreed with Wyatt that the trial court erroneously admitted certain evidence and also held that the trial court impermissibly found the aggravating factors of CCP and that the crime was committed to avoid arrest, errors that were held to be harmless beyond a reasonable doubt.
 
 Id.
 
 at 359-60.
 

 Wyatt filed a motion for postconviction relief, challenging his conviction and sentence of death in this case. Wyatt subsequently amended his motion for postcon-viction relief several times.
 
 [4]
 
 He also filed a separate motion for postconviction relief
 
 *520
 
 relating to the Domino’s Pizza murders in a separate proceeding, raising many of the same claims that he raised in this case.
 

 Following two separate
 
 Huff
 

 [5]
 

 hearings, the postconviction court held an evidentia-ry hearing in August 2007, where Wyatt’s counsel was permitted to present all the evidence on his postconviction claims as it pertained to both the Nydegger murder and the Domino’s Pizza murders. The court issued a detailed sixty-six page order denying all claims related to Wyatt’s third amended motion (claims 1 through 35).
 

 Wyatt appealed the denial of relief to this Court. While the case was pending-before this Court, defense counsel received certain letters from the FBI, stating that the FBI agent’s testimony at Wyatt’s trial regarding comparative bullet lead analysis (CBLA) “exceeds the limits of the science and cannot be supported by the FBI.” Based on these letters, Wyatt filed a motion to relinquish jurisdiction to the post-conviction court. This Court granted the motion and allowed Wyatt to amend his previous supplement to include this claim and directed the circuit court to hold an evidentiary hearing on the allegations regarding CBLA and the allegations that McCoombs lied at trial, to be considered
 
 *521
 
 cumulatively with Wyatt’s prior postcon-vietion claims. The postconviction court held a second evidentiary hearing and issued another order denying relief. This appeal follows. In addition, Wyatt petitions this Court for a writ of habeas corpus.
 

 ANALYSIS
 

 I. RULE 3.850 CLAIMS
 

 Wyatt raises the following claims on appeal: (1) the postconviction court erred in denying his claims pertaining to CBLA and the testimony of McCoombs; (2) trial counsel rendered ineffective assistance of counsel during the penalty phase; (3) trial counsel was ineffective in failing to object to the introduction of gruesome photographs; (4) Wyatt’s rights were violated when he was improperly shackled during his trial; (5) Florida Rule of Criminal Procedure 3.852 is unconstitutional; (6) the penalty-phase jury instructions were unconstitutional; and (7) Florida’s death penalty statute is unconstitutional. We summarily deny claims 3, 4, and 6 as insufficiently pled.
 
 [6]
 
 In addition, we deny without discussion Wyatt’s challenge pertaining to rule 3.852, based on the reasoning we employed in ruling on this claim in Wyatt’s postconviction appeal relating to the Domino’s Pizza murders.
 
 See Wyatt v. State,
 
 71 So.3d 86, 111 (Fla.2011). We also deny claim 7, challenging the constitutionality of the death penalty, based on our well-established precedent.
 
 See, e.g., Tompkins v. State,
 
 994 So.2d 1072, 1081 (Fla.2008);
 
 Lightbourne v. McCollum,
 
 969 So.2d 326, 350-53 (Fla.2007). Wyatt has not made any additional allegations that would call into question the State’s current methods of execution.
 

 A. Patrick McCoombs
 

 In the first claim we address, Wyatt raises two issues: (1) newly discovered evidence shows that McCoombs’ testimony on the stand was false and if the jury had been presented with this information, they would have acquitted him; and (2) the prosecutor violated Brady
 
 [7]
 
 and
 
 Giglio
 

 [8]
 

 by permitting McCoombs to testify that he was not given any benefit for his testimony and by failing to disclose that the prosecutor assisted McCoombs in obtaining mitigation of his federal sentence after Wyatt’s trial was concluded, as well as providing other benefits that were not disclosed to the jury or Wyatt. For the following reasons, we affirm the postconviction court’s denial of relief.
 

 During the Nydegger murder trial, McCoombs testified that he and Wyatt were housed next to each other at the Greenville County Jail in South Carolina before Wyatt was extradited to Florida. Wyatt admitted to killing Nydegger shortly after Wyatt had received a letter from codefendant Lovette. Wyatt ripped up the letter, saying, “[WJell, I’m not going to try to put my crimes on him, anyway, I killed the bitch. I’ll live up to it, it’s not like I’m going to put it on him.”
 

 
 *522
 
 Later, Wyatt provided more details regarding the murder, telling McCoombs that he first met Nydegger when he was partying at a bar with Lovette. They were both drunk, and Wyatt took her out of the bar so they could have sex. However, once Wyatt got her in the car, he “didn’t want to have sex with her anymore, [he] just wanted to kill her.” Wyatt told McCoombs either that he “blew the top of her head off or blew her brains out.” When McCoombs asked Wyatt why he killed the victim, Wyatt responded, “I wanted to see her die.... [W]hy are you so upset about it, she ain’t nothing but a bar fly, she ain’t nobody, nobody cared about her.” Wyatt told McCoombs that he dumped her body at Yeehaw Junction off of Route 60. Wyatt also told McCoombs that he kept two kinds of bullets, regular and hollow-tip, and asked McCoombs whether the State could use it as evidence if he shot a hollow-tip into somebody’s brain. McCoombs testified that at the time he informed the Marshal’s Office regarding his conversations with Wyatt, he had already pled guilty in his own case and had never been promised anything in exchange for his testimony.
 

 In raising the current postconviction claim, Wyatt asserts new evidence demonstrates that McCoombs fabricated his trial testimony and that this evidence would be admissible in a retrial to impeach McCoombs’ original testimony.
 
 [9]
 
 In support, Wyatt presented evidence at the evi-dentiary hearing, including the following: the perpetuated testimony of inmates Scott Rollins and Dennis Morrison, both of whom testified that McCoombs allegedly admitted that he lied when he testified against Wyatt; the affidavit of inmate Emilio Bravo, who also claimed that McCoombs stated he lied at trial;
 
 [10]
 
 and McCoombs’ evidentiary hearing testimony in which he denied that he intended to recant his trial testimony and explained why he wrote the recantation letter.
 

 Wyatt relies principally upon the perpetuated testimony of Rollins and Morrison. However, when Rollins testified, he could not recall many details regarding what McCoombs said. Morrison also testified, stating that McCoombs admitted that Wyatt did not confess to the murder and that McCoombs had received the information to which he testified at trial from the police. Morrison further stated that according to McCoombs, the police wanted Wyatt to talk about the location of a gun, which the police already possessed. During the evidentiary hearing, McCoombs testified and explicitly denied that he had lied at trial.
 

 The postconviction court reviewed all of the testimony and found that McCoombs’ testimony at the evidentiary hearing was more credible than Rollins’ and Morrison’s testimony. Of particular importance to the postconviction court, McCoombs’ trial testimony included statements that McCoombs would not have known about unless Wyatt had told him. This included the following: Wyatt had met Nydegger at a bar and went out to the car with her for fifteen minutes before they came back; he blew the top of her head off and dumped her body near Route 60 at Yeehaw Junction; and Wyatt said that she was “just a barfly.” The court noted that, based on
 
 *523
 
 the timing of when McCoombs and Wyatt were housed near each other, the only discovery document that Wyatt may have had at the time was the State’s extradition affidavit, which did not contain the facts to which McCoombs testified at trial. Moreover, these facts had not been released to the media.
 

 The postconviction court explicitly found that “McCoombs’ evidentiary hearing testimony [was] more credible than the perpetuated testimonies of Rollins and Morrison,” reasoning as follows:
 

 The court finds that the 2002 inmate statements (Rollins and Morrison) and the 2002 recantation letter ... were unknown at the time of trial and could not have been discovered with due diligence.
 

 As to the second prong of the
 
 Jones
 
 standard, the court finds the inmate statements inconsistent with McCoombs’ trial testimony that did not contain information about the firearms or their location. And the inmate statements are not otherwise relevant or credible because they do not address or refute any material fact contained in McCoombs’ extensive trial testimony.... As a result, the court finds McCoombs’ evidentiary hearing testimony more credible than the perpetuated testimonies of Rollins and Morrison. Consequently, even if admissible, the inmate statements would have no eviden-tiary or impeachment value.
 

 In evaluating the second prong of
 
 Jones
 
 for the recantation letter, the court finds that McCoombs did not recant his trial testimony but merely made veiled threats of recantation to call attention to harsh conditions of confinement eleven years after he was a government witness at Wyatt’s trials. Further, the court finds no evidence that McCoombs lied at trial. Much of McCoombs’ extensive trial testimony at both [Wyatt’s Domino’s Pizza murders trial and Nydegger’s murder trial] is consistent with, and corroborated by, other trial testimony and evidence.
 

 In addition the court finds that Wyatt has not proven a source other than Wyatt for any facts testified to by McCoombs, or disproved any of the facts testified to by McCoombs. Consequently, the recantation letter is immaterial to the merits of the case, and lacks impeachment value when viewed as a complaint concerning conditions of confinement eleven years after Wyatt’s trials.
 

 The postconviction court correctly analyzed this claim under
 
 Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998), which requires the defendant to meet the following two-pronged test: (1) “the evidence ‘must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence’ and (2) the evidence “must be of such nature that it would probably produce an acquittal on retrial.”
 
 Id.
 
 (quoting
 
 Torres-Arboleda v. Dugger,
 
 636 So.2d 1321, 1324-25 (Fla.1994)). Further, the court must “ ‘consider all newly discovered evidence which would be admissible’ at trial and then evaluate the “weight of both the newly discovered evidence and the evidence which was introduced at the trial.’ ”
 
 Id.
 
 (quoting
 
 Jones v. State,
 
 591 So.2d 911, 916 (Fla.1991)). This Court does not second-guess the trial court’s credibility determinations and factual findings to the extent they are supported by competent, substantial evidence.
 
 Melendez v. State,
 
 718 So.2d 746, 747-48 (Fla.1998).
 

 Here, the postconviction court denied relief, holding that McCoombs’ testimony was more credible than the inmates’ testimony, and that McCoombs’ testimony was
 
 *524
 
 consistent with the record. The record provides competent, substantial evidence supporting the court’s findings of fact. In fact, as it applies to this case, it is unclear whether the inmates’ testimony concerning the gun could even apply to the Nydegger murder. In this case, Freddie Fox stole Wyatt’s gun and sold it to a pawn shop. Thus, Morrison’s statements that the police were requesting McCoombs to obtain certain statements from Wyatt to verify the location of the gun were inconsistent with the record, as the police knew Fox had stolen Wyatt’s gun and pawned it. Accordingly, we deny relief on Wyatt’s newly discovered evidence claim relating to McCoombs.
 

 Wyatt next alleges that the State violated
 
 Giglio
 
 because the State permitted McCoombs to testify falsely regarding whether McCoombs would receive various benefits in exchange for his testimony against Wyatt. Specifically, he asserts that because McCoombs testified against Wyatt, the State helped McCoombs obtain a reduction in McCoombs’ federal sentence and that the prosecutor left the jury with the false impression that McCoombs’ federal sentence was already fixed and failed to correct this false impression. In order to prove a
 
 Giglio
 
 violation, “a defendant must show that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.”
 
 Tompkins,
 
 994 So.2d at 1091 (quoting
 
 Rhodes v. State,
 
 986 So.2d 501, 508-09 (Fla.2008)). The evidence is considered material “if there is any reasonable possibility that it could have affected the jury’s verdict.”
 
 Id.
 
 (quoting
 
 Rhodes,
 
 986 So.2d at 509). In order to meet this standard, the State must “prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Rhodes,
 
 986 So.2d at 509).
 

 The postconviction court denied relief in an extensive order, relying on McCoombs’ and prosecutor Morgan’s testimony at the evidentiary hearing where both witnesses explicitly denied that they were aware that the state prosecutor had the ability to help McCoombs reduce his already imposed federal sentence and further denied that they had any agreement for sentence mitigation in exchange for McCoombs’ trial testimony. As the court noted, Wyatt failed to present
 
 any
 
 evidence to refute this testimony. In fact, Wyatt acknowledges this, but asserts that the lack of a “smoking gun” is not the end of the inquiry and he challenges the postconviction court’s findings on credibility. However, to support this claim, Wyatt relies solely on speculation.
 

 As this Court has repeatedly held, in reviewing such claims on appeal, we are “bound by the trial court’s credibility determinations and factual findings to the extent they are supported by competent, substantial evidence.”
 
 Rodriguez v. State,
 
 39 So.3d 275, 285 (Fla.2010) (quoting
 
 Jones v. State,
 
 998 So.2d 573, 580 (Fla.2008)). Here, the postconviction court denied relief, finding that McCoombs’ and Morgan’s testimony was credible and that Wyatt failed to show that the State presented false testimony at the guilt or penalty phase. In judging the credibility of these witnesses, the court took careful note as to the fact that McCoombs’ testimony was consistent with the facts established from the record and was consistent with Morgan’s testimony, while the witnesses presented by Wyatt were not consistent with the record. The record provides competent, substantial evidence supporting the court’s findings of fact. Accordingly, we deny relief.
 

 Finally, Wyatt alleges that the State violated
 
 Brady
 
 because the State failed to disclose that it had reached an
 
 *525
 
 agreement with McCoombs where McCoombs would receive various benefits in exchange for his testimony against Wyatt. In order to establish a
 
 Brady
 
 violation, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Way,
 
 760 So.2d at 913 (quoting
 
 United States v. Bagley,
 
 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A reasonable probability is a probability sufficient to undermine this Court’s confidence in the outcome.
 
 Id.; see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936.
 

 This claim suffers from the same problems as the
 
 Giglio
 
 claim — Wyatt has completely failed to show any evidence that there was such an agreement between the State and McCoombs. Accordingly, the postconviction court denied relief based on the lack of evidence to support Wyatt’s claim and its determinations that McCoombs and Morgan were credible during the evidentiary hearing. Because the record provides competent, substantial evidence supporting the court’s findings of fact, we likewise deny relief on Wyatt’s
 
 Brady
 
 claim.
 

 For the reasons addressed above, we deny relief on this claim because it is without merit.
 
 [11]
 

 B. CBLA
 

 Wyatt also contends that he is entitled to a new trial because newly discovered evidence establishes that the FBI admitted to providing false testimony in his trial, which constitutes either a
 
 Brady
 
 or
 
 Giglio
 
 violation. Alternatively, he alleges that he is entitled to relief based on newly discovered evidence under
 
 Jones.
 
 In addition, he summarily asserts that he received ineffective assistance of counsel.
 
 [12]
 

 At the trial, the State called FBI Agent Riley, who testified as an expert on CBLA, which compares the elemental composition of lead bullets for forensic value. Specifically, Agent Riley opined that by comparing the elemental composition of the bullets found in the victim with bullets that Wyatt was known to have possessed after the murder, he was able to determine that the bullet found in Nydegger and the bullets Wyatt possessed after the murders “came from the same box of ammunition” or from another box of ammunition that was manufactured at the same place on the same date.
 

 Years after Wyatt’s trial, on February 10, 2004, the National Research Council (NRC) published a report that
 
 *526
 
 questioned the scientific reliability as to certain aspects of CBLA testimony. On September 1, 2005, the FBI issued a press release announcing that the agency was discontinuing its use of CBLA. On August 7, 2008, while the postconviction appeal was pending before this Court, the FBI informed the State by letter that it had reviewed Agent Riley’s testimony in this case and concluded that his testimony exceeded the scope of the science of CBLA. The letter stated in pertinent part:
 

 After reviewing the testimony of the FBI examiner, it is the opinion of the Federal Bureau of Investigation Laboratory that the examiner stated or implied that the evidentiary specimen(s) could be associated to a single box of ammunition. This type of testimony exceeds the limits of the science and cannot be supported by the FBI.
 

 Your office is encouraged to consult appellate specialists in your jurisdiction to determine whether you have any discovery obligations with respect to the finding stated above. As directed by the Department of Justice, we are notifying the Chief Judge of the court in which this case was tried of the results of our review by copying him or her on this letter.
 

 Additionally, you should be aware that the FBI is cooperating with the Innocence Project. The Innocence Project is interested in determining whether improper bullet lead analysis testimony was material to the conviction of any defendant, and, if so, to ensure appropriate remedial actions are taken.
 

 Based on this letter, Wyatt raised a
 
 Giglio
 
 claim and a
 
 Brady
 
 claim, asserting that the State withheld evidence and failed to correct false testimony given by Agent Riley regarding whether CBLA could support the determination that a certain bullet originated from a certain box of ammunition.
 

 This Court relinquished jurisdiction following the State’s receipt of the FBI letter, and the postconviction court conducted a second evidentiary hearing. The court subsequently denied relief on the revised CBLA claim. We agree with the postcon-viction court. Wyatt’s
 
 Giglio
 
 claim suffers from the same concern that we have thoroughly discussed in the opinion on the postconviction appeal arising from the Domino’s Pizza murder case — Wyatt failed to present any evidence that the prosecutor had knowledge of the problems pertaining to CBLA evidence at the time of trial.
 
 Wyatt,
 
 71 So.3d at 101-02. Accordingly, we deny Wyatt’s
 
 Giglio
 
 claim for the reasons addressed in the postconviction appeal relating to the Domino’s Pizza murder case.
 
 See id.
 
 at 102 (“[T]he postcon-viction court properly found that Wyatt presented no evidence that the prosecutor had knowledge of these alleged falsehoods. As Wyatt’s own experts indicated, research uncovering flaws in CBLA did not surface until well after Wyatt’s trial. Thus, Wyatt has failed to satisfy the second prong of Giglio.... ”).
 

 He also raises a
 
 Brady
 
 claim, asserting that the State suppressed favorable evidence because the State failed to disclose that the CBLA technique to which Agent Riley testified at trial was unscientific and unsound and that there was a lack of comprehensive research necessary to ensure the reliability of CBLA results. Again, as we held in
 
 Wyatt,
 
 71 So.3d at 103:
 

 Wyatt has not satisfied the second
 
 prong of Brady.
 
 Wyatt’s own experts testified that neither the 2008 letter nor any comprehensive research uncovering the flaws in CBLA existed until well after Wyatt’s trial in 1991. Accordingly, the
 
 *527
 
 State could not have willfully or inadvertently suppressed such information.
 

 Wyatt briefly asserts that he received ineffective assistance of counsel “[t]o the extent that defense counsel could have known that junk science was being used against [him].” However, as discussed in more detail in our opinion regarding the Domino’s Pizza murder case, Wyatt has failed to present any evidence that counsel could have discovered the flaws in the CBLA evidence when this evidence did not exist until years after Wyatt’s trial was concluded.
 
 Id.
 
 Defense counsel hired an expert to review the FBI’s CBLA analysis, but did not present this expert at trial because the expert did not have an opinion that was favorable to the defense.
 
 Id.
 
 Accordingly, we deny this claim.
 

 In Wyatt’s remaining CBLA claim, he asserts that he is entitled to a new trial because newly discovered evidence shows that the CBLA testimony, which was relied upon at trial, exceeded the bounds of the science. As addressed above, to obtain a new trial based on newly discovered evidence: (1) “the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence”; and (2) the evidence “must be of such nature that it would probably produce an acquittal on retrial.”
 
 Jones,
 
 709 So.2d at 521 (internal quotation marks omitted). The post-conviction court denied this claim, holding that the letter did not meet the first prong of
 
 Jones
 
 because the letter was not in existence at the time of the 1991 trial. For the reasons we set forth in more detail in our opinion on the Domino’s murders, we hold that the postconviction court erred in concluding that the CBLA claim did not constitute newly discovered evidence on this basis.
 
 See Wyatt,
 
 71 So.3d at 99-100.
 
 [13]
 
 We hold that the case-specific letter authored by the FBI in this case constitutes newly discovered evidence because the letter consists of facts that Wyatt could not have known at the time of trial, and neither Wyatt nor defense counsel could have known of the facts by the use of diligence.
 

 Thus, we turn to the second prong of Jones—whether this newly discovered evidence is of such a nature that it “would probably produce an acquittal on retrial.”
 
 Jones,
 
 709 So.2d at 521. We conclude that this would not probably produce an acquittal for several reasons. First, the CBLA evidence as it was presented at trial supported only that the bullet from the victim matched the bullets that Wyatt left with Fox. As defense counsel elicited during the cross-examination of Agent Riley, the CBLA testing did not reveal who purchased the bullets or whether Wyatt or Lovette fired the fatal bullet.
 

 Furthermore, the evidence against Wyatt included the following: Wyatt admitted to being with Nydegger at the bar and leaving with her; her body was found the next day across the State on State Route 60—close to where he had previously abandoned a stolen car; near Nydeg-ger’s body were stuffed animals that were consistent with the animals that she won
 
 *528
 
 from the crane game that she had played with Wyatt; Wyatt admitted driving her car on the afternoon after she was murdered, which he later abandoned; a pillow found in her abandoned car was similar to the pillows at the hotel where Wyatt stayed the night that he met Nydegger; Wyatt had possessed a gun that was consistent with having fired the fatal shot; when Wyatt discovered that Fox had pawned this gun, he was angry and told Fox that he had used the gun to kill; upon his arrest in South Carolina, Wyatt admitted that his alter ego “Jim” had killed and did bad things in Florida.
 

 In addition, a fellow inmate, Patrick McCoombs, testified that Wyatt admitted he killed Nydegger and that he had wanted to kill her ever since he left the bar with her that evening. He told McCoombs that he blew off the top of her head and dumped the body on State Route 60 near Yeehaw Junction. These details were consistent with the evidence presented at trial and were not available from any source other than Wyatt himself. Based on all of the evidence presented, the elimination of the CBLA evidence would not “probably produce an acquittal” in light of the overwhelming evidence of Wyatt’s guilt. Thus, we deny relief.
 

 C. Ineffective Assistance of Counsel at Penalty Phase
 

 Wyatt alleges that trial counsel was ineffective under
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because counsel (1) failed to fully investigate Wyatt’s social history and present additional family and friends as witnesses to discuss Wyatt’s abusive childhood and history of drug and alcohol abuse; (2) failed to provide a full social history to Dr. Sheldon Rifkin;
 
 [14]
 
 and (3) failed to present the testimony of a mental health expert who could explain the nexus between Wyatt’s long history of child abuse and drug use and the crime.
 
 [15]
 

 As it pertains to this case, the postcon-viction court denied this claim, holding that defense counsel did fully investigate Wyatt’s background and social history, stating as follows:
 

 Wyatt claims that counsel was ineffective for failing to adequately investigate and present mitigating evidence. The crux of [this claim] is that counsel failed to investigate and/or present the testimony of five additional lay witnesses: Sara Cox, Wyatt’s third grade teacher; Darlene Smith, Wyatt’s maternal aunt; Christina Powell, Wyatt’s ex-wife; Renee, Wyatt’s daughter; and Wayne Ed-monson, Wyatt’s maternal uncle. Wyatt contends that these lay witnesses would have disclosed additional facts concerning: the abuse and neglect of Wyatt by his father, stepfather, and grandmother; the impact on Wyatt of his mother’s severe mental illness and her related hospitalizations; the history of Wyatt’s
 
 *529
 
 substance abuse since he was a teenager; the sexual abuse of Wyatt by a teacher; and the impact on Wyatt of his child’s death. In addition, Wyatt claims that trial counsel failed to present expert witness, Dr. Rifkin, or another expert to provide the jury with “some basis of understanding” Wyatt’s behavior and to “explain the nexus between Wyatt’s long history of abuse and drug use and crime.”
 

 As to the lay witnesses, examination of the trial record reveals that during the penalty phase, counsel presented the mitigation testimony of six lay witnesses: Norberto Pietri, a fellow death-row inmate; Jean McDaniels, Wyatt’s mother; Pamela Caudill, Wyatt’s sister; Barry Wyatt, Wyatt’s brother; Kim Wyatt, Wyatt’s sister-in-law; and Max Phillips, Wyatt’s maternal uncle. These lay witnesses testified to: Wyatt’s caring character; the abuse and neglect of Wyatt by his father and stepfather; the impact on Wyatt of his mother’s severe mental illness and her related hospitalizations; the history of Wyatt’s substance abuse since he was a teenager; and the sexual abuse of Wyatt by a teacher. Consequently, Wyatt was not prejudiced by the failure to present the five additional lay witnesses because their mitigation testimony would have been largely cumulative to the evidence presented by the six lay witnesses that did testify at the penalty phase.
 
 Gilliam, v. State,
 
 817 So.2d 768, 781 (Fla.2002). And, counsel cannot be found ineffective for failing to investigate and present cumulative mitigation evidence.
 
 Downs v. State,
 
 740 So.2d 506, 516 (Fla. 1999).
 

 As to the expert witnesses, none were presented at the penalty phase even though Dr. Rifkin and Dr. Mac-Millan were consulted in the preparation of mitigation evidence. At the ev-identiary hearing, [defense counsel] Litty described the mitigation investigation that was conducted for the penalty phase including the documents that were delivered to Dr. Rifkin and reviewed by Litty. Wyatt points to no specific mitigation document that defense counsel failed to obtain and deliver to Dr. Rifkin and/or Dr. MacMil-lan, or that counsel failed to review for the penalty phase.
 

 Litty explained that counsel made a tactical decision to present mitigation testimony through lay witnesses who were “very cooperative, very compelling, and very effective”; thus preventing the introduction of the following unfavorable evidence that would come in if Dr. Rif-kin and/or Dr. MacMillan had testified: Wyatt displayed no evidence of brain damage; Wyatt had a notorious and infamous reputation for being aggressive starting in middle school; in middle school and junior high school Wyatt was involved in all kinds of criminal activities; Wyatt had been physically abusive toward his wife; Wyatt beat a person for at least 30 minutes and locked him in a trunk; Wyatt demonstrated a bias toward homosexual advances; Wyatt has been locked up since he was a juvenile; Wyatt “has shown great entrepreneurship and ingenuity manipulating the system”; Wyatt’s prison nickname was “Killer” for his willingness to fight; Wyatt was diagnosed with an antisocial personality with no psychological defenses to his actions; Wyatt’s “frustration could lead to unpredictable, violent and traumatic, if not catastrophic results”; Wyatt demonstrates underlying dependency needs and a need to dominate most interpersonal situations; Wyatt is insensitive to the needs of others; relies heavily on immediate gratification; steals and deals in drugs; is irritable,
 
 *530
 
 aggressive, and belligerent when he does not obtain his immediate goals and desires; and Wyatt is impulsive, impetuous, demonstrates a pattern of lying, is reckless and shows a disregard for personal safety.
 

 Wyatt counters that counsel should have presented a mental health expert, like postconviction expert witness Dr. Faye Sultan, at the penalty phase to explain how Wyatt’s violent childhood resulted in Wyatt becoming a violent adult; and to “neutralize” otherwise damaging mental health and social history such as the harmful information contained in Dr. Rifkin’s report, and Wyatt’s prior psychological assessments and prison records. The court finds Dr. Sultan’s evidentiary hearing testimony merely a different mental health opinion based on facts largely cumulative to the mitigation evidence investigated and presented by counsel at the penalty phase, and thus not sufficient to support a claim of ineffective assistance of counsel.
 
 Cornell [Corni
 
 l]
 
 v. Dugger,
 
 558 So.2d 422, 426 (Fla.1990) (reasoning mental health examination is not inadequate simply because defendant is able to find experts later to testify favorably based on similar evidence). Therefore, absent a finding that Wyatt’s mental health evaluation was inadequate, Wyatt fails to demonstrate deficient performance and prejudice.
 

 Based on the foregoing analysis, the court finds that counsel conducted a reasonable investigation into Wyatt’s background. Further, the court finds that counsel made a reasonable tactical decision to present mitigation evidence through lay witnesses after conducting the reasonable mitigation investigation.
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000).
 

 In order to show that counsel rendered ineffective assistance, the defendant has the burden to show: (1) that counsel’s performance was deficient, i.e., that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment”; and (2) that the deficient performance prejudiced the defense, i.e., that “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.”
 
 Strickland,,
 
 466 U.S. at 687, 104 S.Ct. 2052. “men evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant’s burden as showing that counsel’s ineffectiveness ‘deprived the defendant of a reliable penalty phase proceeding.’ ”
 
 Asay v. State,
 
 769 So.2d 974, 985 (Fla.2000) (quoting
 
 Rutherford v. State,
 
 727 So.2d 216, 228 (Fla.1998)). In reviewing a postconviction court’s order, this Court gives deference to the trial court’s factual findings, so long as they are supported by competent, substantial evidence, and independently reviews the court’s legal conclusions.
 
 Schoenwetter v. State,
 
 46 So.3d 535, 546 (Fla.2010).
 

 1. Full Investigation and Presentation of Wyatt’s Social History
 

 In Wyatt’s first subclaim on this issue, he asserts that his counsel was ineffective in failing to undertake a complete investigation into Wyatt’s social history and if counsel had done so, counsel could have presented the following information to the jury: Wyatt’s father was physically and emotionally abusive to Wyatt from a very tender age, including forcing him out of babyhood by taking him out of his crib too soon, removing his bottle from him too soon, poking him repeatedly in the chest until he bruised, and yelling at him to be a man; Wyatt witnessed his father choking his mother; Wyatt’s mother was involved with a series of men who were abusive to
 
 *531
 
 her and her children; Wyatt’s stepfather was extremely cruel to his children, especially Wyatt; Wyatt’s stepfather forced the children to fight each other; Wyatt’s mother ran off with another man when Wyatt was sixteen, and his stepfather forced him to run after her and try to get his mother back; Wyatt’s mother was severely mentally ill and institutionalized throughout much of Wyatt’s childhood, requiring that Wyatt’s grandmother care for him; Wyatt confided to Sarah Cox as to some of the things that his mother would do when she was mentally ill, including throwing plates at a wall or running around the house naked; Wyatt abused drugs and alcohol at a very early age; and one of Wyatt’s elementary teachers sexually abused Wyatt by performing oral sex on him, which had a profound effect on Wyatt, including deep feelings of rage and shame.
 

 The postconviction court denied this claim, finding that much of this evidence was cumulative to evidence that was presented at the penalty phase. After reviewing the full record, we agree. At the penalty phase, Wyatt’s mother, Jean McDaniel, testified. She described her mental illness in detail, including the effect it had on Wyatt. She also provided significant information about Wyatt’s difficult childhood, including the abuse he suffered from his natural father as his father tried to make sure that Wyatt would “be a man.” McDaniel also testified as to the emotional abuse that Wyatt suffered from his stepfather when she remarried. McDaniel provided very compelling testimony regarding a male teacher who paid particular attention to Wyatt and picked him up from his grandmother’s house to spend time with him. She later learned that this teacher sexually abused her son and did the same thing to others in the community, devastating them. According to Wyatt’s mother, things changed drastically for Wyatt after this incident. In addition, McDaniel recalled a time when she decided to leave her family for a total stranger. Wyatt tried to “bring his mama back,” but when they reached Columbia, South Carolina, she set him out of the car on the side of the street, even though he did not have any money.
 

 Counsel also called Wyatt’s sister, who testified how difficult it was to grow up as a child in their family, based on their mother’s mental illness, their father’s abuse, and their stepfather’s emotional abuse. She testified that as he got older, Wyatt turned to drugs. Other family members, including Wyatt’s brother and uncle, testified to similar circumstances.
 

 Although Wyatt alleges that trial counsel was ineffective because counsel failed to discover and present certain evidence, the record shows that this favorable evidence had already been presented through lay witnesses. Moreover, if defense counsel had presented a mental health expert to testify as to such matters, this would have provided the State with the opportunity to cross-examine the expert regarding significant unfavorable aspects regarding Wyatt. This was one of the very reasons that defense counsel chose not to present a mental health expert in this case — a decision that was made after consulting with Wyatt himself. Wyatt is unable to point to any significant evidence that was not already presented to the jury. As this Court has held, a defendant can show neither ineffectiveness nor prejudice by asserting that his counsel failed to present testimony that would have been cumulative to testimony the jury already heard.
 
 See Stewart v. State,
 
 37 So.3d 243, 258 (Fla.2010) (“Because the evidence that Stewart argues should have been presented is cumulative, Stewart has demonstrated neither deficiency nor prejudice.”). Accordingly, we deny this subclaim.
 

 
 *532
 

 2. Failure to Present Dr. Riflcin
 

 In his next subclaim, Wyatt alleges that his counsel was ineffective in failing to present Dr. Rifkin.
 
 [16]
 
 The postconviction court found that counsel made a strategic choice regarding the decision to not call Dr. Rifkin as a witness because this decision prevented very damaging testimony from being disclosed to the jury. We affirm this ruling.
 

 The record establishes that counsel made a strategic choice in not presenting this witness because if counsel had chosen to present Dr. Rifkin, the State could have cross-examined this expert regarding significant damaging evidence that Dr. Rifkin relied upon in making his report. This damaging evidence included the following: Dr. Rifkin was unable to find any evidence of brain damage or significant mitigating circumstances; Wyatt developed a reputation in middle school for being aggressive and became involved in criminal activity; Wyatt stole his grandmother’s car; when he was released from prison at 17, his attitude was that people should not “f — ” with him because he was dangerous; Wyatt was physically abusive to his wife; Wyatt bragged that he was very effective at manipulating the system; Wyatt continued drug activities in prison where he was known by the nickname “Killer”; and Wyatt had antisocial personality disorder with criminal tendencies.
 

 This Court has repeatedly held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone,
 
 768 So.2d at 1048. Here, based on the significant damaging testimony that likely would have been disclosed if Dr. Rifkin testified, we conclude that counsel was not ineffective in failing to present this witness but instead choosing to present lay witnesses who would testify as to the mitigating circumstances without exposing the defense to the same type of damaging testimony as Dr. Rifkin’s testimony would have done. Accordingly, we deny relief on this claim.
 

 3. Failure to Present the Testimony of a Mental Health ExpeH Regarding the Nexus Between Child Abuse and Drug Use and the Crime
 

 In the third and final subclaim, Wyatt contends that his trial counsel was ineffective in failing to present the testimony of a mental health expert regarding the nexus between child abuse and drug usage and this crime. In support, at the eviden-tiary hearing, Wyatt presented Dr. Faye Sultan, who recalled much of the same abusive stories as to Wyatt’s childhood that the jury heard. Dr. Sultan then opined that because Wyatt was a victim of crimes and an abusive childhood, this background had a direct connection to the crimes that he later committed. The post-conviction court denied this subclaim, stating as follows: “The court finds Dr. Sultan’s evidentiary hearing testimony merely a different mental health opinion based on facts largely cumulative to the mitigation evidence investigated and presented by counsel at the penalty phase, and thus not sufficient to support a claim of ineffective assistance of counsel.”
 

 
 *533
 
 We affirm the denial of relief on this subclaim. As this Court has repeatedly held, a defendant cannot establish that trial counsel was ineffective in obtaining and presenting mental mitigation merely by presenting a new expert who has a more favorable report.
 
 See Peede v. State,
 
 955 So.2d 480, 494 (Fla.2007) (“The fact that Peede produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective”)- Here, Wyatt alleges nothing more other than that his expert had a different opinion from Dr. Rifkin, who found little mitigation in this particular case. For the reasons above, we deny relief on this claim.
 

 II. HABEAS CORPUS PETITION
 

 Wyatt also filed a petition for writ of habeas corpus, asserting that his appellate counsel was ineffective by failing to raise four meritorious claims on appeal. In order to be entitled to relief, Wyatt must show: “appellate counsel’s performance was deficient because ‘the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance’ and “the petitioner was prejudiced because appellate counsel’s deficiency ‘compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.’”
 
 Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000) (emphasis omitted) (quoting
 
 Thompson v. State,
 
 759 So.2d 650, 660 (Fla.2000)). This Court will not find appellate counsel’s performance ineffective for failing to raise an issue that would have been found to be procedurally barred if it had been raised on direct appeal or for failing to raise an issue that “would in all probability have been found to be without merit” had counsel raised the issue on direct appeal.
 
 Id.
 
 (quoting
 
 Williamson v. Dugger,
 
 651 So.2d 84, 86 (Fla.1994)). Moreover, as appellate counsel must often limit the brief to assert only the strongest arguments, this Court has held that “appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue.”
 
 Valle v. Moore,
 
 837 So.2d 905, 908 (Fla.2002).
 

 A. Failure to Raise Claim Regarding Prior Markings on the Evidence
 

 In his first habeas claim, Wyatt asserts that his appellate counsel was ineffective in failing to raise the claim that the trial court erroneously admitted, over objection, specific pieces of evidence that had markings demonstrating that the evidence had been used in another case or markings that used the word “homicides.” Although the record shows that the trial court cured these issues by marking out those notations, Wyatt speculates that this would have been difficult to do, based on the number of markings. He further hypothesizes that the jury may have been able to decipher the markings and may have been able to determine that this evidence was introduced in a separate trial regarding other crimes against Wyatt.
 

 Counsel was not ineffective in failing to raise this claim on direct appeal because, although defense counsel initially objected to the markings, the trial court cured this objection by removing the markings. Defense counsel did not reassert that this action was insufficient. Thus, the issue was procedurally barred. Moreover, counsel cannot be considered ineffective for failing to raise an argument that relies on pure speculation.
 
 See Knight v. State,
 
 923 So.2d 387, 394 (Fla. 2005) (rejecting defendant’s claim that ap
 
 *534
 
 pellate counsel was ineffective in failing to challenge on appeal the court’s refusal to individually voir dire prospective jurors regarding their views on the death penalty, finding that such a claim amounted to little more than speculation). Counsel speculates that the jury would understand that the markings showed the evidence was admitted in another case against Wyatt himself, as opposed to being used in trial against codefendant Lovette. Wyatt has failed to demonstrate that appellate counsel’s deficiency, if any, “compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.”
 
 Rutherford,
 
 774 So.2d at 643 (quoting
 
 Thompson,
 
 759 So.2d at 660). Accordingly, we deny this claim.
 

 B. Failure to Raise Claim, Regarding the Admission of a Gruesome Photograph
 

 Second, Wyatt asserts that his counsel was ineffective in failing to challenge the ruling pertaining to the admission of a gruesome photograph, which showed one of the victim’s tattoos, as well as blood on the victim’s face. We deny this claim since the record reflects that appellate counsel did raise this issue on direct appeal.
 

 C. Failure to Raise Claim Regarding Questions During Voir Dire
 

 In his third claim, Wyatt alleges that his appellate counsel was ineffective in failing to challenge a line of questioning during voir dire where the State discussed that sometimes a murder occurs in order to eliminate a witness. Defense counsel objected, asserting that the prosecutor was attempting to give an opening statement during voir dire. The trial court overruled the objection, and the prosecutor continued asking a juror if he understood that the State could prove its case without relying on eyewitness testimony to the murder. Counsel objected again.
 

 As this Court has recognized, “where a juror’s attitude about a particular legal doctrine ... is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine even if stated in the form of hypothetical questions.”
 
 Geralds v. State,
 
 — So.3d-, -, 2010 WL 3582955 (Fla.2010) (quoting
 
 Walker v. State,
 
 724 So.2d 1232, 1233 (Fla. 4th DCA 1999)). The scope of voir dire questioning rests in the sound discretion of the trial court, and we will not disturb the trial court’s ruling unless the court clearly abused its discretion.
 
 Id.
 
 The State can inquire from the prospective jurors on matters regarding the burden of proof and whether a juror can apply the law even though the State would not be presenting any eyewitness testimony. In addition, the State can discuss possible aggravating circumstances in the abstract where the State believes the evidence would support such factors. Wyatt’s argument assumes that the discussion of legal theories in the abstract will bias the jurors and cause them to presume such circumstances transpired in the case before them. However, as Wyatt recognizes, after counsel objected, the trial judge explicitly instructed the jurors that such circumstances did not necessarily occur in this ease.
 

 Even if the statement had been improper, however, Wyatt failed to establish prejudice — that “appellate counsel’s deficiency ‘compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.’ ”
 
 Rutherford,
 
 774 So.2d at 643 (quoting
 
 Thompson,
 
 759 So.2d at 660);
 
 see, e.g., Bell v. State,
 
 965 So.2d 48, 78-79 (Fla.2007) (holding that the defendant failed to establish his appellate counsel was ineffective in failing to challenge a ruling pertaining to an isolated
 
 *535
 
 comment that was made during voir dire before the presentation of evidence even began). Thus, we deny this claim.
 

 D. Failure to Challenge Rule Regarding Prohibition of Juror Interviews
 

 Finally, Wyatt claims that appellate counsel rendered ineffective assistance by failing to challenge Florida’s rule that prohibits counsel from interviewing jurors, which he contends is unconstitutional. We have consistently rejected this same claim.
 
 See, e.g., Wyatt,
 
 71 So.3d at 112 n. 20;
 
 Floyd v. State,
 
 18 So.3d 432, 459 (Fla.2009) (“[W]e have repeatedly rejected claims that rule 4 — 3.5(d)(4) is unconstitutional.”). Accordingly, appellate counsel was not ineffective for failing to raise this nonmerito-rious issue on direct appeal.
 

 CONCLUSION
 

 Based on the foregoing, we affirm the postconviction court’s denial of relief, and we also deny Wyatt’s habeas petition.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . Evidence regarding the prior crimes was introduced during the penalty phase, but was excluded during the guilt phase unless it was directly relevant to the Nydegger murder.
 

 [2]
 

 . Michael Lovette was tried for this crime in a separate proceeding, and he is serving a life sentence for the Nydegger murder.
 

 [3]
 

 . Wyatt raised the following claims: (1) the trial court improperly instructed the jury on flight: (2) the State engaged in improper cross-examination of Wyatt; (3) defense was precluded from conducting relevant and timely discovery regarding State witness Jennifer Oler (the bartender of Club 92); (4) the trial court improperly prevented the defense from asking the venire as to predispositions regarding the death penalty; (5) the trial court erred in admitting an autopsy photograph of Nydeg-ger; (6) the trial court improperly sustained the State's objection to the questioning of the manager of a motel regarding issues pertaining to Freddie Fox; (7) the trial court improperly terminated the cross-examination of Fox and made improper remarks during the cross-examination of Wyatt; (8) the trial court erred in overruling numerous instances of improper character evidence, including evidence that Wyatt said if he had possessed a gun when he was arrested, he would have shot the officer, that Wyatt hit a person over the head with a bottle, and that Wyatt feigned a conversion to Christianity; (9) the standard reasonable doubt instruction is unconstitutional; (10) the prosecutor made impermissible closing arguments during the guilt phase, which constitutes fundamental error; (11) the trial court erred in finding the following ag-gravators: the murder was committed during the commission of a robbery; the murder was committed to avoid arrest; and the murder was CCP; (12) the trial court did not properly consider or weigh all the mitigating evidence presented by the defense; (13) the penalty-phase jury instructions were erroneous; (14) the State presented improper hearsay testimony of several police officers concerning Wyatt's prior violent felonies; (15) the prosecutor made impermissible closing arguments in the penalty phase; and (16) Florida’s death penalty statute is unconstitutional.
 

 [4]
 

 . Specifically, Wyatt raised the following claims to the postconviction court: (1) public records were withheld in violation of chapter 119, Florida Statutes; (2) section 119.19 of the Florida Statutes and Florida Rule of Criminal Procedure 3.852 are unconstitutional; (3) his trial counsel rendered ineffective assistance of counsel based on numerous issues including failing to object to the prosecutor forcing Wyatt to testify as to the veracity of the State’s witnesses, failing to object to the prosecutor's improper questions, failing to object to the State's introduction of irrelevant crimes, which were unrelated to Nydegger’s murder, failing to object to the introduction of the DNA evidence, failing to object to improper rebuttal, failing to object to the State’s misrepresentation of ballistics testimony, failing to object to the State's misrepresentation of Wyatt’s testimony concerning the police dog, and failing to secure a complete mental health evaluation of Wyatt, among other various claims; (4) Wyatt’s convictions are constitutionally unreliable due to newly discovered evidence that McCoombs fabricated his trial testimony concerning Wyatt’s alleged confession; (5) the State withheld material and exculpatory evidence and presented the misleading testimony of McCoombs at both the guilt and penalty phases; (6) trial counsel was ineffective in failing to move for individual voir dire and for failing to remove jurors Norfleet and Georgilis; (7) trial counsel failed to properly litigate misleading testimony and improper argument; (8) trial counsel was ineffective in failing to obtain an adequate mental health evaluation and failing to provide the necessary background information to the mental health consultant pursuant to
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (9) trial counsel failed to investigate defenses concerning insanity, drugs and alcohol, and cocaine psychosis; (10) the trial court erred in admitting grue
 
 *520
 
 some photographs, and trial counsel was ineffective in failing to object to penalty-phase testimony concerning details of a prior violent felony; (11) trial counsel was ineffective in failing to adequately investigate and present mitigating evidence and refusing to present Wyatt as a penalty-phase witness; (12) trial counsel was ineffective in failing to object to the defendant's absence at a trial conference; (13) trial counsel was ineffective in failing to object to penalty-phase jury instructions that improperly shifted the burden of proof to the defendant; (14) trial counsel was ineffective in failing to object to an erroneous jury instruction regarding expert witness testimony; (15) trial counsel was ineffective in failing to challenge the instructions regarding the avoid arrest aggravator and the CCP aggravator; (16) trial counsel was ineffective in failing to challenge the jury instructions relating to the "committed during the commission of a felony” aggravator; (17) trial counsel was ineffective in failing to challenge the jury instruction relating to the pecuniary gain aggravator; (18) trial counsel was ineffective in failing to challenge the jury instruction relating to the "under sentence of imprisonment” aggravator; (19) trial counsel was ineffective in failing to object to the introduction of nonstatuto-ry aggravating factors; (20) trial counsel was ineffective in failing to litigate whether the jury was misled as to its role in sentencing; (21) the rule prohibiting the defendant from interviewing the jurors is unconstitutional; (22) trial counsel was ineffective in failing to challenge the trial court's decision to instruct the jury on the "heinous, atrocious, or cruel” aggravator; (23) trial counsel was ineffective in failing to request a jury instruction on mercy and sympathy; (24) execution by electrocution or lethal injection constitutes cruel and unusual punishment; (25) Florida's capital sentencing statute is unconstitutional; (26) trial counsel was ineffective in failing to litigate whether the trial court refused to find and weigh mitigation established in the record; (27) trial counsel was ineffective in failing to object to the trial court's finding of the "avoid arrest” circumstance; (28) Wyatt was denied a proper direct appeal based on an incomplete record; (29) the Florida Supreme Court did not conduct a proper harmless error analysis after striking the CCP aggravator; (30) trial counsel was ineffective in failing to preserve the shackling issue for appeal, which denied Wyatt a fair trial; (31) the finder of fact used unconstitutionally obtained prior convictions as an aggravating circumstance; (32) trial counsel was ineffective in failing to object to the "commission in the course of a felony” aggravating circumstance on the ground that it operates as an "automatic” aggravating circumstance; (33) Wyatt’s conviction and sentence are unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (34) newly discovered evidence of false and misleading testimony exists concerning comparative bullet lead analysis (CBLA); and (35) Florida's lethal injection statute is an unconstitutional delegation of legislative authority and provides for cruel and unusual punishment.
 

 [5]
 

 .
 
 Huff v. State,
 
 622 So.2d 982 (Fla. 1993).
 

 [6]
 

 .Pertaining to claim 3, the introduction of gruesome photographs, counsel has failed to specifically identify any photographs in this case that were improperly admitted. Regarding claim 4, whether Wyatt was shackled, Wyatt concedes the record fails to provide support for this claim, and he is raising it in the event that he is successful in overturning Rule Regulating the Florida Bar 4-3.5(d)(4). Pertaining to claim 6, the jury instructions claim, counsel fails to discuss which specific instructions were allegedly erroneous or what specific challenges trial counsel should have raised.
 

 [7]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [8]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [9]
 

 . While the parties and postconviction court use the word "recantation” in discussing this claim, Wyatt is not raising an actual recantation claim because McCoombs testified during the evidentiary hearing that he was
 
 not
 
 recanting his trial testimony. Instead, Wyatt is asserting that new evidence demonstrates that McCoombs fabricated his trial testimony.
 

 [10]
 

 . This affidavit was not admitted at the evi-dentiary hearing since Bravo refused to submit to questioning.
 

 [11]
 

 . Wyatt alleges that the postconviction court erred because it did not consider the cumulative effect if both the CBLA and McCoombs’ testimony are excluded. However, as addressed above, because we hold that the McCoombs claim is without merit, this Court does not need to employ a cumulative error analysis.
 

 [12]
 

 . The parties raise many of the same legal issues that were presented in the postconviction appeal in the Domino’s Pizza murder case: whether the CBLA claim is time-barred; whether the documents supporting the CBLA claim can constitute newly discovered evidence; whether the State violated
 
 Brady
 
 and
 
 Giglio;
 
 and whether counsel rendered ineffective assistance of counsel in failing to challenge CBLA evidence.
 
 See Wyatt,
 
 71 So.3d at 97-103.
 

 [13]
 

 . As addressed in that opinion, the postcon-viction court reached this conclusion based on language in
 
 Kearse v. State,
 
 969 So.2d 976, 987 (Fla.2007), which involved different circumstances and stated that the "evidence must have existed ... at the time of trial.” We have since clarified that the language "must have existed ... at the time of trial,” which was promulgated by this Court in
 
 Kearse
 
 and applied by the postconviction court in this case, has never been a part of the newly discovered evidence analysis and was an incorrect recitation of the test set forth in the
 
 Jones
 
 decision.
 
 Wyatt,
 
 71 So.3d at 100.
 

 [14]
 

 . Because this claim focuses on defense counsel’s alleged deficiencies rather than the deficiencies of his mental health expert, it is properly analyzed under
 
 Strickland,
 
 as opposed to a claim under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
 
 See Raleigh v. State,
 
 932 So.2d 1054, 1062 n. 13 (Fla.2006).
 

 [15]
 

 . In addition, Wyatt asserts two additional claims that we summarily deny because they are refuted by the record. First, Wyatt alleges that his counsel failed to secure the evaluation of a neuropsychologist. However, the record shows that in this proceeding, his trial counsel did indeed move for the trial court to appoint a neuropsychologist for use in the Nydegger murder trial, a request the trial court denied. Counsel cannot be deficient merely because his motion was unsuccessful. Second, Wyatt asserts that counsel failed to proffer all of the mitigation to the trial court after Wyatt waived mitigation. However, in this case, Wyatt did not waive mitigation. Thus, this claim is also denied.
 

 [16]
 

 . Wyatt also alleges that counsel was ineffective by failing to present Dr. Rifkin with Wyatt's full social history. We deny this portion of the claim as insufficiently pled since Wyatt has failed to point out or present any evidence to support this claim, other than his conclusory statements. Moreover, even if the Court considered this claim on the merits, a review of Dr. Rifkin's report demonstrates that Dr. Rifkin knew about Wyatt’s social history and relied on that information significantly.